MAX RASKIN, RUTH R. RASKIN, MURRAY I. MACKLER AND PAULINE O. MACKLER, SUBSTITUTED FOR ALICE P. WORK, PLAINTIFFS-APPELLANTS, v. TOWN OF MORRISTOWN, THE ALDERMEN OF THE TOWN OF MORRISTOWN, AND W. PARSONS TODD, AS MAYOR OF THE TOWN OF MORRISTOWN, AND THE PLANNING BOARD OF THE TOWN OF MORRISTOWN, DEFENDANTS-RESPONDENTS.

Argued January 30, 1956—Decided March 21, 1956.

*Mr. Benjamin Franklin,* III, argued the cause for appellants (*Messrs. Mills, Jeffers & Mountain,* attorneys).

*Mr. Leonard Tolkoff* argued the cause for respondent (*Mr. E. Marco Stirone,* attorney).

The opinion of the court was delivered by

HEHER, J. The basic issue here is the legal sufficiency of a local zoning regulation adopted June 14, 1954, by way of an amendment to the original ordinance, establishing an "Office Building District," comprising two properties of plaintiffs, that is to say, a large dwelling house on the northwesterly corner of Hamilton Drive and South Street, in Morristown, hereafter to be referred to as "Dwelling House," and a dwelling on the northeasterly corner of the same intersection, to be designated as "Apartment House," and four adjacent parcels of land, the only classification of its kind within the municipality.

The contention is that the particular rule does not comport with the requirements of *R. S.* 40:55–32 that zoning regulations shall be "in accordance with a comprehensive plan" designed to serve the considerations of "health, welfare and safety of the community as a whole," but was rather the "culmination of a series of small zoning changes, each made at the behest of a property owner or small group of property owners, and was brought about at the instigation of the handful of Hamilton Drive residents to protect and benefit their properties by restricting any development of the Work properties," without "reasonable consideration of the character of the district" and the fact that it "will not conserve property values and encourage the most appropriate use of land throughout the municipality," and so the rule is arbitrary, unreasonable and discriminatory in contravention of constitutional precept, federal and state.

The action is in lieu of *certiorari.* The proofs were taken before Judge Hall; but the issue was determined by Judge

Hughes under assignment by the Chief Justice, on the full record and his view of the *locus* in the company of counsel for the parties. The holding was that the "evidence bespeaks the intent at least to plan comprehensively that the Office Building Zone should be a zone of protective screen to help preserve the adjoining residential area"; that "In these days of decentralization of concentrated urban uses (as in the case of light industrial decentralization) a community legitimately may plan to attract from the large cities uses comparable to the office building use," and "As a corollary, it may create, with due regard to the uniformity required by zoning legislation, a district restricted to such use and excluding other business or commercial uses"; that account is to be taken of the "administrative relief from the hardship resulting from comprehensive uniformity in the zone plan" afforded by *R. S.* 40:55–39, whereby a landowner "suffering hardship from the vicissitudes of change and encroachment is not foreclosed from that remedy and is not remitted for his relief to an attack upon the basic zoning law"; and that the challenged regulation "is a part of the comprehensive zoning plan of the community and has not been shown to be unreasonable, arbitrary or illegal."

Plaintiffs' appeal to the Appellate Division of the Superior Court from the consequent judgment was certified here for decision on our own motion.

I.

It is urged *in limine* that for want of the procedural due process secured by *Article I, paragraph 1* of the 1947 *Constitution of New Jersey* and the Fourteenth Amendment to the *Federal Constitution*, the cause should be remanded for a new trial. The specific ground is that the "Judge who rendered the decision was not the Judge who tried the case, and the record discloses no findings of fact, report or statement of conclusions submitted by the trier of the case."

The point is not well made. All the evidence taken was reviewed by Judge Hughes, as the record governing the

formulation of the judgment. The proofs are largely documentary. There is conflict only in the opinion evidence as to the factors touching the reasonableness of the use regulations and the consequences of a commercial use of plaintiffs' properties upon the residential use of Hamilton Drive. As we shall see *infra*, witness-demeanor does not play a decisive part in the assessment of this testimony. There can be no doubt of the observance of the essentials of due process outlined in *Hyman v. Muller*, 1 *N. J.* 124 (1949), invoked by plaintiffs.

*R. R.* 4:65-1 provides that where "by reason of death, sickness, disability or termination of office, a judge is unable to discharge his duties in any matter, another judge may act in his stead; but if the latter is satisfied that he cannot discharge those duties, he may order a new trial of all or any of the issues, entertain a reargument or, in a case tried without a jury, direct the recalling of any witnesses, or make such disposition of the matter as the circumstances warrant." Under this rule a new trial is in order if that course be in the interest of essential justice; but there is no such showing here.

The case is not within the letter of the rule. But that is of no moment. The principle is the same; and the course taken did not transcend sound discretion. There is no constitutional requirement that in any and all circumstances the power of decision lies only with the judge who heard the testimony. Under the 1844 Constitution, the old Supreme Court *en banc* heard all *certiorari* proceedings on testimony taken by a commissioner or master, who made no findings of fact. So also with all other original proceedings before the Supreme Court in which factual issues required the taking of testimony. See *Rule* 191 *et seq.* of the old Supreme Court (1938 *ed.*). Such was the traditional mode of proceeding in the English chancery—by interrogatories administered to the witnesses either by the regular examiners of the court, or through the medium of commissioners specially appointed for the purpose. *Daniell's Chancery Pleading & Practice* (*Perkin's ed.*) 1045, 1053, 1069. See *Jackson v.*

*Jackson's Ex'rs,* 3 *N. J. Eq.* 96 (*Ch.* 1834). And in modern equity practice, the taking of the testimony of witnesses by deposition had general sanction. See *Comp. Stat.* 1910, *p.* 423. But the oral hearing before the vice-chancellor or advisory master was made the general course by rule. *Rule* 120 of the Court of Chancery (1938 *ed.*). See also *Rule* 124.

The 1947 *Constitution, Article* VI, *Section* V, *paragraph* 3, confers upon the Supreme Court and the Appellate Division of the Superior Court "such original jurisdiction as may be necessary to the complete determination of any cause on review"; and there is no suggestion that testimony needed in the exercise of this jurisdiction may be had only by means of a hearing of the witnesses in open court. And by rule the Supreme Court and the Appellate Division, on a review of non-jury cases, may make "new or amended findings of fact," but regard is to be had to the opportunity of the trial judge to assay the credibility of the witnesses. *R. R.* 1:5–3(*a*); 4:53–1. See also *R. R.* 4:88–13, making the same provision on a review of proceedings in lieu of prerogative writs.

The value of witness-demeanor in assessing testimonial trustworthiness depends upon the particular circumstances; it is not a constitutional *sine qua non.*

Under the 1947 *Constitution,* the Chief Justice is the administrative head of all the courts; and he may from "time to time transfer Judges from one assignment to another, as need appears." *Article* VI, *Section* VII, *paragraphs* 1, 2.

## II.

The amendment is to be assayed, for motivation and purpose, in the context of local zoning history and the supposed need deemed relevant to the exercise of the zoning function. There can be no doubt that the local legislative authority had in view the alleviation of the consequences of prior amendments of the regulations and ill-considered variances contrary to the essential constitutional and statutory principle of comprehensive zoning by districts in furtherance of the considerations justifying the exertion of the power, one or

more, for the common good rather than individual benefit. Indeed, the local authority defends the amendment as a development of "the concept of a buffer area, *i. e.*, an area having certain business characteristics, but also with residential qualities which would separate the general business district from the residential district, and thereby protect the fine residential neighborhood from the heavy traffic, delivery services, piles of rubbish, boxes, etc., common to the rear of ordinary retail stores," and so the "Office Building District" was "part of a comprehensive plan."

The plaintiff Work became the owner of the "Dwelling House" on April 10, 1942. Her mother had acquired the property for her benefit on June 29, 1939, when she was a minor. The plaintiff, herself, purchased the "Apartment House" on April 26, 1944. Shortly before the trial of this action, she contracted to convey both properties to the plaintiffs Raskin and Mackler for the consideration price of $150,000; and after trial was had she made conveyance to the vendees pursuant to the contract, and they were substituted as parties plaintiff.

By the original zoning ordinance of December 21, 1928, in force when the property was acquired by the plaintiff Work, the "Dwelling House" was located in a Residence "A" zone, the highest residential classification made by the ordinance. The adjacent property on the west and all the properties to the rear of the "Dwelling House," and to the east on the same side of South Street and along Madison Avenue, were in residential use, all in the same Residence "A" zone; and on the same side of South Street, to the west of the property adjoining the "Dwelling House," there were several substantial dwelling houses in a Residence "C" zone, a multiple dwelling or apartment house district having a depth of 200 feet. To the west of these residences there was a business district at the intersection of Elm and South Streets, embracing a number of one-story shops and stores, some with second-story apartments. Diagonally across South Street, to the east of the "Dwelling House," was the Winchester Inn, a colonial type structure operated as a restau-

rant unlicensed to sell liquor. To the west of the Inn, on the same side of the street, there was a small private tennis club, and then a six-story apartment house, with vacant land between. This area along the southerly side of South Street, to a depth of 200 feet, running from James Street to Headley Road, a distance of approximately 1,400 feet, was in a Residence "C" zone. The land to the east of this strip, and behind it, was zoned Residence "A."

Hamilton Drive forms a "T" intersection with the northerly side of South Street. To the west there is a long block extending to Elm Street; to the east, a short block consisting of two large parcels of land located on the north side of South Street, terminating at the intersection of Madison Avenue. The area under consideration, on the southerly side of South Street, is bounded by Headley Road, which is a short distance to the east of the Madison Avenue-South Street intersection, and James Street, a short distance to the east of the Elm Street-South Street intersection.

On March 19, 1943, by an amendment of the zoning ordinance, the Residence "C" zone on the north side of South Street was extended to Madison Avenue on the east, to include the "Dwelling House," the "Apartment House," and the property east of the "Apartment House" to a depth of 200 feet from the South Street sideline.

The "Apartment House" acquired April 26, 1944 was a large four-family residence, opposite the Westchester Inn on the south side of South Street. It seems to be conceded that the area was then unchanged in character. To the rear or north side of plaintiffs' two properties were the dwellings fronting on Hamilton Drive, which is described, as of that time and now, as a "fine old residential neighborhood."

World War II was followed by a marked change in the character of the area, due to the growth of the community attending the establishment of new industries and commercial enterprises; and the "Dwelling House" and "Apartment House" are now in a quarter that is commercial in nature. Across the street the Winchester Inn has been enlarged and their new facilities include a bar and a cocktail lounge; a

large Sears, Roebuck retail store, a luncheonette and a dry-cleaning plant face plaintiffs' properties; and just down the street there are a large Food Fair and liquor stores and an appliance shop; to the east of the Inn there is a large bank building of the Morristown Trust Company and an office building of the South Headley Corporation; on the same side of South Street, in the old business district to the west, there is a large and heavily trafficked exit from a Grand Union food store, and a large four-story office building of the Beneficial Management Corporation adjoins the "Dwelling House" on the west; and to the east of the "Apartment House," still on the same side of the street, there is a branch of the First National Iron Bank of Morristown.

And the residential area in the rear to the north and east of plaintiffs' properties and Hamilton Drive has undergone a significant change. There have been serious inroads on its single-family residence use. Many residences to the east on Madison Avenue are now used as apartments and professional offices; and several blocks to the east there are a newly-constructed hospital and a nurses' building. The residences on Franklin Street, from Elm Street to Hamilton Drive, are now almost entirely devoted to apartment use and professional offices; several of the residences on Franklin Place, which runs into Franklin Street at its intersection with the rear end of Hamilton Drive, have been converted to apartment use; and a five-story apartment house is to be constructed on Hill Street, at the northerly end of Franklin Place. To the east of the intersection of Hamilton Drive and Franklin Street, several blocks to the rear and east of plaintiffs' properties, there is a large construction company depot, at the intersection of Ford Avenue and Franklin Street; and numerous garden apartments have been erected along Franklin Street. Traffic has grown apace. South Street has become a main traffic artery; it has three lanes; and it is proposed to increase its width by cutting into plaintiffs' property and removing the sidewalks. Parking is now completely forbidden on Hamilton Drive, and along one side of South Street. There is evidence of a traffic count of 1,320 cars per

hour on South Street and a normal capacity of 700 cars per hour.

Plaintiffs affirm that the "changes along South Street were directly brought about by a series of changes in the zoning regulations of the area, by way of variance or amendment." Respondents concede that "Between 1943 and 1953 amendments to the zoning ordinance were made and variances were granted so that the residential characteristics of the area changed materially"; but it is suggested that the amendments were the result of economic pressures attending the increase of population and the consequent need for new housing and commercial facilities. And it is urged that "it is within the legitimate aspirations of the municipality to seek to attract from the large cities uses comparable to the office building use."

On February 7, 1947 the zoning ordinance was amended to provide a "new section" described as "Section 5-J47 Garden Type Apartment Districts"; and 450 apartments of this class were erected. On June 6 ensuing a variance was granted permitting the use for "Garden Type Apartment purposes" of lands adjacent to the "Apartment House," on the west.

On August 18, 1948 an amendment of the ordinance was adopted zoning for general business uses a plot 200' x 900' running along the southerly side of South Street, from James Street to the Inn, and a large area on the east side of Elm Street, north of the old business district, also restricted to residential uses under the former regulation. On the first plot, the Food Fair, liquor, appliance and Sears-Roebuck stores were established; on the second, the Grand Union store with its South Street exit was built.

On December 15, 1949, a dress-shop variance was allowed for a property half way between the "Dwelling House" and the old business district to the west, on the north side of South Street; and on August 30, 1951, a variance was granted permitting the South Headley Corporation to erect an office building on the southwesterly corner of South Street and Headley Road, and shortly thereafter the structure was built.

Meanwhile, Messrs. Hughes and McCrosky, community and regional development planning consultants, were retained by Morristown to review its zoning regulations and set up a comprehensive plan for the development of the town. Later on, December 3, 1951, they submitted a master plan to the local planning board. This plan would have placed the area on the north side of South Street, from the old business district to Hamilton Drive, including the "Dwelling House" and the westerly Hamilton Drive area, in an S-3 Residence District, a third-class single family residence district; also the area to the rear of the new business district on the south side of South Street, from James Street to the easterly side line of the Inn, a strip 200 feet in depth. The north side of South Street, from Hamilton Drive to the east, including the "Apartment House," and the area to the east of the new business district, on the south side of South Street, were to be classified as an S-1 Residence District, the highest single-family residence classification. But there was no mention of an office building district. On December 17, 1952 the planning board unanimously approved this submission with minor changes.

On December 8, 1952 a variance was allowed the Morristown Trust Company for the construction of a large two-story building, for "banking use," on the parcel of land between the Inn and the South Headley property, adjacent to the latter on the west; and the building was erected. On December 22, 1952 a like variance was given the First National Iron Bank of Morristown permitting the construction and operation of a one-story bank building on the tract adjacent to the "Apartment House" on the east, on the north side of South Street, opposite the bank of the Morristown Trust Company.

Both these variances were contrary to the master plan and were opposed by the planning consultant, McCrosky, and the local planning board.

And on March 23, 1953 the zoning ordinance was amended to extend the business district to the westerly line of the "Dwelling House." It is conceded that the purpose of the

amendment was "to permit the Beneficial Management Corporation to erect a large four-story colonial type office building within the area"; and it is said that "Beneficial purchased six residential properties which adjoined the 'dwelling house' lot comprising 465 feet frontage on South Street and seven or eight properties to the rear thereof fronting on Franklin Street," and erected a "large attractive office building thereon." Beneficial's tract thus placed in a general business zone fronts on the north side of South Street from the old business district to the "Dwelling House," adjacent to the residence properties on the west side of Hamilton Drive. This change was also contrary to the recently approved master plan; and it was done in deference to Beneficial's insistence that its land be zoned for business uses, although it was then planned to use the site for an office building. There is no denial of plaintiffs' suggestion that such was the case.

Thereafter, on November 9, 1953, the zoning ordinance was amended, again contrary to the master plan, to provide for an "Office Building District" "devoted exclusively to the conduct of business, not including manufacturing of any kind, storing materials, retail or wholesale selling of any kind," but including these specific uses: "banks, insurance offices, executive offices, and offices as used by the professions as are permitted in a residence zone." The Office Building District comprised but six properties for a depth of 200 feet from either side of South Street, two banks, a restaurant, one office building, the "Dwelling House" excepting a 25-foot strip to the rear, and the "Apartment House." Adjoining was Beneficial's office building in a general business zone; and there remained the 25-foot strip, approximately 280 feet long, to the rear of the "Dwelling House," the only Residence "C" zone in the area, as a "buffer" for the benefit of the Hamilton Drive residence section. This course was taken at the instance of the residents of Hamilton Drive, whose representative, Mr. Fuller, testified that he suggested the "office building zone," "rather than to change zoning to give" Beneficial "permission to put up their building on the basis

of a variance," a course opposed by Beneficial "principally
on the grounds that it would interfere with their getting
financing for their building," and the "new classification of
zoning restricted to office buildings" would "prevent the sort
of thing being built that we were faced with on the opposite
side of South Street." The mayor concurred in this proposal.

Then came the amendment of 1954, maintaining by sec-
tion 9 the Office Building District, downgrading to an S-3
Residence District the area to the north of the Office Building
District, and permitting in the Office Building District an
S-2 Residence use, a higher classification than S-3 governing
the Hamilton Drive section to the north. Municipal park-
ing lots were permitted on the assumption of need in every
district regardless of size, despite the disapproval of con-
sultant McCrosky. But professional offices were barred in
the newly-created district, although a permissible use in
other districts.

Defendants say that the plaintiff Work "was aggrieved that
her properties were not included in the business zone as
amended, and filed her complaint on September 22, 1953."
But it is urged that "at the time of the filing of the complaint
a definite Office Building District was in the process of
formulation, said district to include plaintiff's property";
that "Insofar as the area in question is concerned the revised
ordinance (of June 14, 1954) merely adopted the then
existing zoning regulations including the Office Building
District, except that it downgraded the area to the rear and
north of plaintiff's property from Residence 'A' to Residence
'S-3'"; that "By variances," e. g., those granted the Headley
Corporation, the Morristown Trust Company, and the First
National Iron Bank, "the Town thereby retained control of
the residence zone and yet permitted the creation of the
buffer area which they had in mind," and "If these variances
were improper, the time to have challenged them was when
they were passed, not after the character of the area had
changed," and "In any event, as a consequence of these vari-
ances the character of the area was established as an office
district and bank zone"; that "In the early part of 1953 the

Town still had no specific office building district," but "the desire of the Beneficial Management Corporation to erect their main office building in Morristown coincided with the buffer area concept and the Town having been assured that an office building would be erected thereon, extended the general business area on the northerly side of South Street to include all property from Elm Street to the westerly line of the 'dwelling house,' " and "With the completion of the Beneficial Management building the character of the neighborhood as an office district was now clearly established," and thereby "the fine old established residential area nearby would be protected from the delivery services, piles of rubbish and boxes which accompany a general business area comprising ordinary stores."

But this conception does not comport with the constitutional and statutory principle of restricting to particular districts, and regulating therein, buildings and structures according to their construction and the nature and extent of their use, and the nature and extent of the uses of land, conformably to a comprehensive plan designed to serve the interests of health, safety, morals, or the general good and welfare.

The police power thus invoked is an attribute of sovereignty; but its exercise is perforce contained by the constitutional limitations, 1947 *Constitution, Article* IV, *Section* VI, *paragraph* 2, and by the terms of the conforming legislative grant to the municipalities. The powers of municipal corporations formed for local government are limited to "those granted in express terms" and "those of necessary or fair implication, or incident to the powers expressly conferred, or essential thereto, and not inconsistent with or prohibited" by the Constitution "or by law." 1947 *State Constitution, Article* IV, *Section* VII, *paragraph* 11. See also *New Jersey Good Humor, Inc. v. Board of Com'rs of Borough of Bradley Beach,* 124 *N. J. L.* 162 (*E. & A.* 1940).

The essence of zoning, as so often said, is territorial division in consonance with the character of the lands and structures and their peculiar suitability for particular uses, and

uniformity of use within the division. *Schmidt v. Board of Adjustment, etc., Newark,* 9 *N. J.* 405 (1952); *Potts v. Board of Adjustment of Borough of Princeton,* 133 *N. J. L.* 230 (*Sup. Ct.* 1945); *Mansfield & Swett, Inc. v. Town of West Orange,* 120 *N. J. L.* 145 (*Sup. Ct.* 1938). It is fundamental in zoning policy that all property in like circumstances be treated alike. The use restraints must be general and uniform in the particular district. *Beirn v. Morris,* 14 *N. J.* 529 (1954). All this, in virtue of the legislative grant itself, quite apart from constitutional precepts for the fulfillment of basic civil liberties.

All such regulations shall be "uniform for each class or kind of buildings or other structures or uses of land throughout each district, but the regulations in one district may differ from those in other districts." *R. S.* 40:55–31, as amended by *L.* 1948, *c.* 305. The regulations shall be "in accordance with a comprehensive plan and designed" to serve the enumerated statutory purposes related to the common weal; and such regulations shall be made, and this provision has particular significance here, "with reasonable consideration, among other things, to the character of the district and its peculiar suitability for particular uses, and with a view of conserving the value of property and encouraging the most appropriate use of land throughout the municipality." *R. S.* 40:55–32.

Here, the essential statutory principle was disregarded. Plaintiffs' properties are situate in an area peculiarly suitable for general business, indeed their highest and best use when considered in the setting of their environment; and the restriction of the *locus* to office buildings would plainly constitute an undue curtailment of a natural use quite appropriate to the community's expanding business economy, not to serve an essential public need, but rather the particular interests of the residents of Hamilton Drive whose rear view might otherwise be marred by the "delivery services, rubbish, boxes, etc. common to the rear of ordinary retail stores," minor inconveniences and irritations, it would seem, bordering on the artistic and the aesthetic, that are not beyond the

reach of the police power by other less drastic means. And Beneficial's property, adjoining the "Dwelling House," had been zoned for general business uses in advance of the erection of the office building, the governing body knowing that such was the purpose; and so the property has the broader business classification denied to adjacent properties similarly circumstanced, a concession to this individual owner not in the public interest, and therefore arbitrary and capricious. All this, notwithstanding the statutory mandate, *R. S.* 40:55–32, *supra,* that the zoning regulations shall take into account the character of the district and "its peculiar suitability for particular uses."

Thus it is that the amendment constitutes an unreasonable and arbitrary interference with plaintiffs' basic right of property, in contravention of the constitutional and statutory zoning policy. There is no rational ground for denying to plaintiffs the business uses common to the adjacent properties in the enlarged business zone; and to do so would deprive plaintiffs of their private property without advancing the common good. See *Yokley's Zoning Law and Practice,* (*2d ed.*), *section* 54.

The police power is the public right to reasonable regulation for the general welfare. The constitutional principles of due process and the equal protection of the laws demand that the exercise of the power be devoid of unreason and arbitrariness, and that the means chosen for the fulfillment of the policy bear a reasonable and substantial relation to that end. And it is of the essence of zoning that there be a rational relation between the regulation and the service of the common well-being in an area of action within the range of the statutory policy. Excesses are forbidden. Undue discrimination in treatment and classification vitiates the regulation. Arbitrary deviation from the general rule is inadmissible, on constitutional principle as well as the policy of the statute. Constitutional uniformity and equality requires that classification be founded in real and not feigned differences related to the purposes for which the classes are formed, *i. e.,* zoning by districts according to a comprehensive

plan that takes into account the "nature and extent" of the use of land and buildings, to subserve the enumerated statutory considerations, some or all, the regulations to have reasonable regard for the character of the district and "its peculiar suitability for particular uses." *Katobimar Realty Company v. Webster*, 20 *N. J.* 114 (1956).

Apropos of like zoning provisions, the Maryland Court of Appeals said that the power to impose restrictions "is invoked for the protection of the property restricted and not to give protection to surrounding property. It is basic to the law of property that a man shall be allowed the widest use of his property consonant with the protection of his neighbors." *Chayt v. Maryland Jockey Club of Baltimore City*, 179 *Md.* 390, 18 *A. 2d* 856 (*Ct. App.* 1941).

The principle was reiterated in a later case:

"Lines between use districts must be drawn somewhere. It is common knowledge that, long before zoning and ever since, residential neighborhoods have bordered on commercial or industrial neighborhoods. Sometimes the borders of restricted neighborhoods are protected from undesirable adjoining neighborhoods by landscaping or architectural plans. If a residential neighborhood desires protection by a border of unused property, necessarily it must provide its own property, not appropriate its neighbors', for this purpose. * * * Property owners in a Residential district cannot create a 'no man's land' at the border of their own district by forbidding one property owner in an adjoining district from making any use at all of his property, or any use for which it is 'peculiarly suitable'— especially when the adjoining district has been zoned for suitable uses for fifteen years." *Northwest Merchants Terminal, Inc. v. O'Rourke*, 191 *Md.* 171, 187, 60 *A. 2d* 743 (*Ct. App.* 1948).

And later on the same court, referring to the last-cited case, declared:

"It is admitted by a member of the City Council that the part of the lot in question was zoned as a 'buffer' between the residential and the industrial sections and the Board so found. This is not a valid reason for residential zoning. * * * (T)he only tangible reason given in support of the board's minority veto is the establishment of a 'buffer' to protect the residences on Maude Avenue. This is no more lawful in original zoning than in re-zoning." *Hoffman v. Mayor and City Council of Baltimore*, 197 *Md.* 294, 79 *A. 2d* 367 (*Ct. App.* 1951).

As said in *Phipps v. City of Chicago,* 339 *Ill.* 315, 171
*N. E.* 289 (*Sup. Ct.* 1930), the power to amend a zoning
ordinance is not "arbitrary and could not be exercised merely
because someone wanted it done or thought it ought to be
done. It could only be exercised when the public good de-
manded or required that the amendment be made." The
standard is not the "advantage or detriment" to particular
neighboring landowners, but rather the effect on the entire
community as a social, economic and political unit. *Mansfield
& Swett, Inc. v. Town of West Orange,* cited *supra.*

In a case involving the classification of the *locus* for
residence use, to the exclusion of business and industry, the
Federal Supreme Court, reversing the Supreme Judicial
Court of Massachusetts, said:

"The governmental power to interfere by zoning regulations with
the general rights of the land owner by restricting the character of
his use, is not unlimited, and other questions aside, such restriction
cannot be imposed if it does not bear a substantial relation to the
public health, safety, morals, or general welfare. * * * That
the invasion of the property of plaintiff in error was serious and
highly injurious is clearly established; and, since a necessary basis
for the support of that invasion is wanting, the action of the zoning
authorities comes within the ban of the 14th Amendment and can-
not be sustained." *Nectow v. City of Cambridge,* 277 *U. S.* 183,
48 *S. Ct.* 447, 72 *L. Ed.* 842 (1928).

Such is the rationale of *Euclid, Ohio, v. Ambler Realty Co.,*
272 *U. S.* 365, 47 *S. Ct.* 114, 71 *L. Ed.* 303 (1926). See
also *Arverne Bay Construction Company v. Thatcher,* 278
*N. Y.* 222, 232, 15 *N. E.* 2d 587, 117 *A. L. R.* 1110 (*Ct. App.*
1938); *Long v. City of Highland Park,* 329 *Mich.* 146, 45
*N. W.* 2d 10 (*Sup. Ct.* 1950); *Dowsey v. Village of Kensing-
ton,* 231 *App. Div.* 746, 245 *N. Y. S.* 819 (*App. Div.* 1930),
affirmed 257 *N. Y.* 221, 177 *N. E.* 427, 86 *A. L. R.* 642 (*Ct.
App.* 1931), where a residence zone property bordered on an
adjoining town zoned for business at the border, and the
business use "would not depreciate the value of property"
nearby.

The office-building use limitation thus laid upon plaintiffs'
properties by the terms of the zoning amendments does not

bear a real and substantial relation to the public health, safety, morals, or welfare; it is plainly not within the societal policy declared in the enabling statute, but rather an arbitrary and unreasonable restraint upon the fundamental right of private property and on undue exercise of the police power. For the principle, see *Lionshead Lake, Inc., v. Township of Wayne*, 10 *N. J.* 165 (1952), appeal dismissed 344 *U. S.* 919, 73 *S. Ct.* 386, 97 *L. Ed.* 708 (1953). The burden cannot be in excess of the public need. This principle is of the very nature of constitutional zoning.

These amendments were manifestly not the product of comprehensive planning for the public well-being, but rather a submission to individual interest in defiance of the master plan devised by consultants retained to resolve problems created in large part by prior violations of zoning principle, *e. g.*, the extension of the business zone to include Beneficial's office building, but not the adjoining "Dwelling House." There is no need to repeat the other deviations of substance. The commercial uses in the area were ignored, although in the main the result of municipal action—a *fait accompli*. The breakdown in the residential privacy of Hamilton Drive had already set in; the business zone of Beneficial's tract has a longer common boundary with the Hamilton Drive residential area than has the Office Building District; the banks were then a commercial operation; and, because of the heavy traffic, no parking is allowed on Hamilton Drive, now downgraded to S-3 Residence by the master plan and the zoning amendment of 1954. The virtue of a "buffer" zone in these circumstances is not perceivable. And plaintiffs' properties are no longer in a section suitable for residential uses. There is no rational ground, related to the principle of zoning policy, for the restriction of this relatively small area to banking and office building uses, even to the exclusion of professional offices. The adjacent properties on the south side of South Street, as well as Beneficial's office building, are in a general business zone. It is in evidence that there is "not very much" demand for "office building sites in Morristown," and it is unlikely "it would

be a paying investment." In a word, the local legislative action was not taken with due regard to the character of the district and its peculiar suitability for particular uses. Compare *Appley v. Township Committee of Bernards Township*, 128 *N. J. L.* 195 (*Sup. Ct.* 1942) ; *Phillips v. Township Council, etc., Teaneck*, 120 *N. J. L.* 45 (*Sup. Ct.* 1938). There is evidence tending to show that the value of plaintiffs' properties is 25% less than would be the case were they zoned for general business.

The history proves the vice of the ill-advised variance in the struggle under economic pressures to maintain the integrity of established use zones. The consequences of the errors of the past cannot justly be visited upon the plaintiff landowners.

In his enlightening discussion of comprehensive planning, Professor Haar said: "(Z)oning without planning lacks coherence and discipline in the pursuit of goals of public welfare which the whole municipal regulatory process is supposed to serve." *In Accordance with a Comprehensive Plan*, 68 *Harvard L. Rev.* 1154. Our "comprehensive plan" provision was taken from the *Standard State Zoning Enabling Act of the Department of Commerce, section* 3, with this explanatory note: "This will prevent haphazard or piecemeal zoning. No zoning should be done without such a comprehensive study." See also *Yokley's Zoning Law and Practice*, 2d ed., sections 11, 56.

We do not proscribe the "buffer zone" *eo nomine* under any and all circumstances. We are not now called upon to do more than determine the given case. Circumstances vary cases; and it is particularly true of zoning that each case depends upon its own facts.

It results that the office-building regulations embodied in the zoning amendments of November 9, 1953 and June 14, 1954 constitute an infringement of plaintiffs' essential right of property, and are wholly ineffectual. So also, the extension of the general business district, by the amendment of March 23, 1953, to include Beneficial's property but not the adjacent lands similarly situated. And, such being the case, it would

seem that re-zoning is indicated, for otherwise the 25' x 280' strip to the rear of the "Dwelling House" would remain isolated in the only Residence "C" district in the municipality, and plaintiffs' properties and those of the Morristown Trust Company, the South Headley Corporation, and the Westchester Inn would also lie in the Residence "C" district, and the adjacent property of the First National Iron Bank in the only Residence "D" zone, a garden-apartment classification. The amendment of November 9, 1953 suggests that the local authorities considered the superseded regulations unsuitable.

The judgment is accordingly reversed; and the cause is remanded for conforming judicial action.

WACHENFELD, J., concurring in reversal, not in the opinion.

*For reversal*—Justices HEHER, OLIPHANT, WACHENFELD and BURLING—4.

*For affirmance*—Chief Justice VANDERBILT, and Justices JACOBS and BRENNAN—3.