84 N.J. Super. 525 (1964)
202 A.2d 865
TIDEWATER OIL COMPANY, A CORPORATION, GEORGE D. EMERY COMPANY, A CORPORATION, AND ZOLTAN YUHASZ AND FLORENCE YUHASZ, HIS WIFE, PLAINTIFFS-RESPONDENTS, AND M & T CHEMICALS INC., INTERVENOR-RESPONDENT,
v.
MAYOR AND COUNCIL OF THE BOROUGH OF CARTERET, A MUNICIPAL CORPORATION OF THE STATE OF NEW JERSEY, AND EDWARD ZANAT, BUILDING INSPECTOR OF THE BOROUGH OF CARTERET, DEFENDANTS-APPELLANTS.
Superior Court of New Jersey, Appellate Division.
Argued June 15, 1964.
Decided July 1, 1964.
*528 Before Judges CONFORD, FREUND and SULLIVAN.
Mr. Benedict W. Harrington argued the cause for appellants (Messrs. Kessler, Kessler & Harrington, attorneys).
Mr. Emory C. Risley argued the cause for intervenor-respondent (Messrs. Stryker, Tams & Dill, attorneys).
Mr. Sam Weiss argued the cause for respondents (Messrs. Jacobson & Winter, attorneys; Mr. Weiss, on the brief).
The opinion of the court was delivered by FREUND, J.A.D.
Defendants appeal from a final judgment of the Superior Court, Law Division, declaring invalid those portions of the Borough of Carteret zoning ordinance, as adopted May 8, 1963, which divided the then existing heavy industrial zone into two parts, and placed use restrictions on one which were not made applicable to the other.
The factual background is fully set forth in the trial court's opinion, see Tidewater Oil Co. v. Mayor, etc., of Carteret, 80 *529 N.J. Super. 283, 285-88 (Law Div. 1963), and we adopt the factual discussion therein except where inconsistent with or amplified by what is stated in this opinion. We further adopt the trial court's findings of fact that the May 8 amendment was enacted in good faith, and did not violate vested rights on the part of any of the plaintiffs. In this regard, it is clear that while it was Tidewater's application to build a petroleum storage facility which gave rise to the municipal concern with a spread of that kind of industry in the borough, see Roselle v. Mayor and Council of Borough of Moonachie, 49 N.J. Super. 35, 40 (App. Div. 1958), and therefore some of the testimony deals with "keeping Tidewater out," the ultimate objective of the governing body was keeping the petroleum storage industry out of the entire section of the heavy industrial area where it had not yet penetrated, rather than merely excluding Tidewater.
For purposes of convenience we reiterate the facts crucial to an appellate determination of the present cause. Carteret's original heavy industrial zone, as designated in its initial zoning ordinance of 1958, was, by amendment in March 1963, divided into two zones, the "Heavy Industrial A Zone" and the "Heavy Industrial B Zone." For technical reasons, the entire zoning ordinance, including this amendment, was reenacted on May 8, 1963. Although geographically and geophysically Zone B is as well (if not better) adapted for petroleum storage and refining as Zone A, the past industrial development of the Carteret waterfront (Arthur Kill on the eastern boundary and the Rahway River on the northern boundary) was such that the area now in Zone A is occupied to a great extent by large petroleum storage tanks, but that in Zone B is free of such "tank farms." Zone B does contain, however, several heavy industrial facilities which involve the maufacture and storage of petroleum derivatives. Under the May 8 ordinance the uses permitted in Zone A are exactly those which were permitted under the original single heavy industrial zone ordinance, but the following uses, permitted in Zone A, were prohibited in Zone B:
*530 "1-1 The storage, manufacturing, refining or blending, of oil, oils, gas, gasoline, petroleum, crude oil, tars or any of the volatile, flammable, or explosive component parts of oil, gasoline, kerosene, petroleum, or crude oil or oils, or any of the inflammable, volatile or explosive liquids which are or can be derivative from gasoline, crude oil, tars or parts thereof, excepting however, storage of oil, fuel oil, gas or gasoline or petroleum for on-the-premises consumption for heat, fuel, power or other required consumption on the same premises in said zone where they are stored or maintained, and not for off-the-premises distribution or consumption.
1-2 No tanks or other containers or structures for storage or maintenance of such articles for off-the-premises distribution, use or consumption shall be erected, built, constructed, maintained, used or operated but only such as are essential for on-the-premises consumption in connection with a manufacturing or processing use or pursuit of another nature permitted in said zone. The lone exceptions will be those persons, companies, corporations, etc. who are and have been carrying on such functions or operations prior to the date of the adoption of the ordinance."
The trial court found that the exclusion of new petroleum industries in Zone B was "not in accordance with a classification of land uses reasonably related to and in furtherance of the statutory zoning purposes." 80 N.J. Super., at p. 296. The appeal from that determination was argued before this court on June 15, 1964. That very night the borough council voted unanimously to adopt an amendment to section XII-1 of the zoning ordinance, which prescribed the permitted and prohibited uses for Zone B. It is well settled that, in respect of zoning uses, the law in effect at the time an appellate court decides a cause generally governs the disposition thereof, not the law prevailing when the case was decided in the trial court. Roselle v. Mayor and Council of Borough of Moonachie, 48 N.J. Super. 17, 21-22 (App. Div. 1957). All the parties concede this case is to be decided on the basis of the ordinance as amended June 15, 1964. Supplemental briefs have been submitted in relation to the issues encompassed thereby. The broad question now before us is whether or not the ordinance of May 8, 1963, as altered by the June 15, 1964 amendment, is a valid exercise of the municipal police power as applied to this municipality.
*531 The 1964 amendment, insofar as it parallels the former section XII-1, reads:
"1. In the Heavy Industrial `B' (H.I.B.) Zone, a lot may be used and a structure erected, altered or occupied for any use permitted in the Heavy Industrial `A' (H.I.A.) Zone, except for the following prohibited uses:
1-1. The storage or refining of oil, gas, gasoline, petroleum, crude oil or tars is not permitted excepting, however, storage of oil, fuel oil, gas, gasoline or petroleum for on-the-premises consumption for heat, fuel, power or other required consumption on the same premises in said zone where they are stored or maintained, and not for off-the-premises consumption or distribution is permitted.
1-2. No tanks or other structures for the storage or refining of oil, oils, gas, gasoline, petroleum, crude oil or tars for off-the-premises distribution or consumption shall be erected, built, constructed, maintained, used or operated."
Subparagraph 1-3 states that no industrial or manufacturing uses shall be permitted in Zone B except after the zoning board issues a permit. Conditions for the grant of such a permit are then described. There is no challenge here as to the validity of this procedure.
It is thus seen that, basically, the prohibition in Zone B under the 1963 ordinance was not only of petroleum storage and refining but also of all manufacturing and processing involving petroleum derivatives. The 1964 ordinance eliminated the prohibition of the latter. This serves, accordingly, to dispose of the basis for that portion of the trial court's invalidation of the zoning plan which rests on the creation thereby of a large number of nonconforming uses in Zone B. As the ordinance now stands, the prohibition in Zone B is confined to the storage or refining of petroleum and petroleum products. As to this, there is no resulting nonconformity since there are no existing petroleum storage or refining facilities in Zone B.
Since, however, much of both the trial court's opinion and the briefs of plaintiffs may be regarded as addressed to the supposed illegality of the present zone plan even as confined to a prohibition of petroleum storage and refining in Zone B *532 (the uses Tidewater wants to make of the property it has selected), we will address ourselves to the arguments advanced in that regard. Basically, the contention is that the municipal split of the former Industrial Zone into A and B zones, barring petroleum storage, etc., from the latter, though purporting to rest on considerations of safety and traffic and similar factors, is actually so unjustified by the facts pertinent to those considerations, in the light of the evidence adduced at the trial, as to render the legislative action arbitrary and capricious. While the argument is not sound even as related to safety and traffic, as we shall demonstrate, it is necessary to point out that the municipal zoning viewpoint in adopting this zone scheme was somewhat more comprehensive than as assumed by plaintiffs.
Both judicial notice and the evidence in this case reveal that the northeast coastal section of New Jersey, particularly around New York Bay and its indentations, surrounding Carteret on all sides, is fertile territory for oil storage terminals. Moreover, such facilities tend, as a municipal representative in this case testified, to "mushroom" in an area where begun. Carteret's waterfront heavy industrial area had over the years developed massive petroleum storage facilities in its northern sector, now classified as Zone A. With the making known of Tidewater's intent to establish such a facility in the southern portion of the heavy industrial area, it was feared, according to one of the councilmen, that the proposed and other oil plants would "push out" the more diversified kinds of industries, generally of a processing or manufacturing type, then in the area, which it was felt were better for the community in terms of tax ratables, job opportunities for residents of the town, and freedom from "inherent dangers," as well as avoiding traffic congestion. A member of the planning board testified to a fear of the town's becoming swamped with mammoth oil tank installations. He said: "We have tanks all around [us]. In fact we are surrounded by them."
In deciding where to draw the line for preventing expansion of "tank farms" in the heavy industrial area, the planning *533 board and council made the entirely logical decision to restrict such operations to the portion of the area then already penetrated, and indeed long dominated, by such facilities. This was the northern segment lying on both the Rahway River and the Arthur Kill, generally north of Roosevelt Avenue. That area, moreover, was low and swampy, and thus less suitable for the diversified industries which would find better accommodation on the high, firm ground along the Kill in the southern portion of the industrial area, now classified as Zone B.
A great deal of emphasis was placed in the testimony for the municipality on the feared impact of a large number of added tank truck movements on the traffic situation in the borough. This municipality is unusually vulnerable to truck traffic congestion. It has only one or two streets capable of feeding heavy motorized traffic into and out of the municipality. These vary from 30 to 35 feet in width. According to the borough's proofs, two-way traffic of 44-foot tank trucks would present a real problem on such streets, especially at turns and where vehicles are parked at roadside. There is no road access out of the borough from the north except via the New Jersey Turnpike. Road access to the west and south is available, but is very limited in degree. The proofs are that the main artery, Roosevelt Avenue, is already heavily laden in the vicinity of the Carteret Zone B with oil truck and other industrial traffic from the Hess plant and other industries in Woodbridge, to the south. The added tank trucks, not alone from the proposed Tidewater plant, but from others which might establish petroleum depots in Zone B if the present ordinance were invalidated, could, it was feared, add greatly to traffic congestion throughout the entire municipality. The borough argues that there are no private roads on industrial lands in Zone B of any substantial length to help handle the industrial traffic problem there, as contrasted with the presence of such an auxiliary private road in Zone A.
The borough officials were also concerned with the safety problem involved in large aggregations of petroleum tanks *534 concentrated within a few hundred feet of schools, churches and homes. They realize that, to a degree, this condition already exists in Zone A, but they argue that they have a right to prevent its spread to areas of the town not yet affected. Plaintiffs have, as noted in the opinion of the trial court, attempted to prove that the danger of fire or explosion from modern, properly erected oil storage tanks is inconsequential. However, our courts have referred to the fact that gasoline is a "highly inflammable and explosive substance." Reingold v. Harper, 6 N.J. 182, 191 (1951); Reinauer Realty Corp. v. Nucera, 59 N.J. Super. 189, 202 (App. Div.), certification denied 32 N.J. 347 (1960) (involving an application for a variance for construction of 600,000-gallon tanks for storage of gasoline and fuel oil). It does not seem to us that the officials of Carteret were capricious in giving weight to the dangers of fire or explosion (perhaps including the hazard from falling aircraft) from concentrations of large oil tanks close to population centers in classifying zones for appropriate land uses.
Plaintiffs, in addition to minimizing the factual pertinence of the zoning factors relied upon by the borough in creating Zone B, stress heavily that the area in question has prime economic utility for the petroleum business, particularly because of its location on deep water. It is not denied, however, that many other types of industry find it advantageous to be located on deep water in New York Bay.
With the foregoing expanded factual setting of this controversy in mind, we turn to the legal questions of municipal zoning power presented.
There can be no doubt that a municipality has the power, through zoning, to determine the development of its municipal character by prohibiting, either partially or entirely, certain activities or uses, if within reason. See, e.g., Morris v. Postma, 41 N.J. 354 (1964) (drive-in restaurants); Vickers v. Township Com. of Gloucester Tp., 37 N.J. 232 (1962), and Hohl v. Readington Tp., 37 N.J. 271 (1962) (trailer camps); Fanale v. Borough of Hasbrouck Heights, *535 26 N.J. 320 (1958) (apartment houses); Pierro v. Baxendale, 20 N.J. 17 (1955) (hotels and motels); Duffcon Concrete Products v. Borough of Cresskill, 1 N.J. 509 (1949) (all heavy industry). The question is whether Carteret may, in furtherance of valid zoning purposes and without practicing invidious discrimination, divide an area which has long been devoted to heavy industrial uses into two zones which are in roughly equal proximity to other zones and of variable adaptability to the petroleum industry, and prohibit the storage (and refining) of petroleum in one of those zones, where it does not now exist, and allow it in the other, where it has long existed to a large extent. Noting that each case of this sort must be decided on its own facts, Fanale v. Borough of Hasbrouck Heights, supra, 26 N.J., at p. 326, we hold that the municipality may, under the evidence in this case, do so.
Conceding, arguendo, that Zone A and Zone B are equally suited to the petroleum storage industry, the general proposition that all property in like circumstances should be treated alike, see, e.g., Roselle v. Wright, 21 N.J. 400, 409 (1956), Beirn v. Morris, 14 N.J. 529, 535 (1954), is one which in certain instances "must yield to realities." Kozesnik v. Montgomery Twp., 24 N.J. 154, 172 (1957).
"Dissimilar treatment does not inevitably bespeak capriciousness. If all property similarly situated had to be accorded identical treatment, the objective of a well-balanced community might be frustrated. If the public welfare is found to lie in the creation of a number of districts for various uses, lines must be drawn somewhere, and it may well happen, especially in rural areas, that little will distinguish properties on both sides of a given line. The final test must be whether the municipality is seeking to advance the community interest rather than some private or sectional advantage. Raskin v. Town of Morristown, supra (21 N.J. 180)." Id.
While the entire waterfront area, originally included in the single heavy industrial zone, has long been open to the petroleum industry, the development of that area, as was noted above, has been such that the establishment of petroleum storage facilities has in fact been limited to that portion which is now designated Zone A. The establishment of zoning *536 lines according to the uses to which the area being divided is presently subject, even though the land on each side of that line has identical physical characteristics, is as perfectly legitimate a differentiation as the drawing of zone lines according to geographical distinctions. Compare Bogert v. Washington Twp., 25 N.J. 57, 63 (1957). The principle is the same even if the area zoned against a given use, and where it has not yet taken hold, has superior economic utility for the use than the zone where it has become established. The question is still the over-all reasonableness of the municipal zoning treatment. In our view, the fears of the community at large that Tidewater's proposed use of property in Zone B for purposes of a petroleum storage terminal would in the not distant future be followed by other similar activities in that area are not unjustified. Indeed, the very adaptability of the area for that use, plus the fact that much of the entire surrounding area in and out of Carteret has already been so appropriated, indicate the likelihood of such a development. The objective of keeping its heavy industrial area diversified, rather than having it contain nothing more than acre upon acre of "tank farms," is surely a legitimate one in the pursuit of the "objective of a well-balanced community."
Zoning ordinances are not, of course, immutable; reasonable changes therein, based upon "changed viewpoints as to the needs and interests of the entire community," are valid exercises of the zoning power. Gruber v. Mayor and Tp. Com. of Raritan Tp., 39 N.J. 1, 11 (1962); see also Kozesnik v. Montgomery Twp., supra, 24 N.J., at p. 167. In the instant case, private economic interests should not be permitted to veto the wishes of the community at large when it discovers that its original plan for heavy industry threatens to take an undesired turn. The fact that the land in Zone B is well adapted for the purposes to which Tidewater would put it does not mean the borough is obligated to refrain from prohibiting the proposed use. Only where the zoning prohibitions are so restrictive as to allow nothing but economically unfeasible or otherwise inappropriate uses, while forbidding practical utilization *537 of the land, will they be stricken down as confiscatory. Morris County Land Improvement Co. v. Parsippany-Troy Hills Tp., 40 N.J. 539, 557 (1963); and see Finn v. Wayne Tp., 53 N.J. Super. 405, 412-14 (App. Div. 1959). This, of course, is not contended to be the case here. As was said in the Morris County Land case:
"Of course, property need not be zoned to permit every use to which it is adapted nor must all property similarly situated be accorded identical treatment. To so require would frustrate the zoning objective of a well-balanced community according to a comprehensive plan. It is sufficient if the regulations permit some reasonable use of the property in the light of the statutory purposes. See Kozesnik v. Montgomery Township, supra (24 N.J., at p. 172)." 40 N.J., at p. 557. (Emphasis added)
Indeed, uses which were at one time approved may by reason of their very number, and perhaps for that reason only, become undesirable. Under these circumstances a municipality has the power to prohibit the proliferation thereof. See Fanale v. Borough of Hasbrouck Heights, supra, 26 N.J., at p. 326; Kozesnik v. Montgomery Twp., supra, 24 N.J., at p. 173; compare Shipman v. Town of Montclair, 16 N.J. Super. 365, 370-71 (App. Div. 1951).
We conclude, therefore, that despite the economic suitability of Zone B for petroleum storage, Carteret has the right to "draw the line and shut the door" on further expansion of petroleum tank storage facilities, particularly where, as here, no such facilities presently exist in Zone B.
It remains to consider whether such action is in furtherance of a valid zoning purpose, see R.S. 40:55-32. The present Zone B is occupied by various and diversified industrial enterprises. The continuance of at least a portion of a heavy industrial zone in such a diversified state is, in our view, a valid zoning purpose. It is in furtherance of "the general welfare" within the generally accepted broad interpretation of that phrase. See Vickers v. Township Com. of Gloucester Tp., supra, 37 N.J., at p. 247; Hochberg v. Board of Adjustment of the Borough of Freehold, 40 N.J. Super. 276, 286 (App. Div. 1956).
*538 We have already mentioned our opinion that Carteret's fears concerning the eventual complete domination of Zone B by tank farms is not unjustified. Whether such a state of affairs is desirable or not is for the community, not the courts, to determine, and absent a complete lack of reasonableness the judiciary will not interfere. See Kozesnik v. Montgomery Twp., supra, 24 N.J., at p. 168.
It is inferable from the evidence here that the local officials could reasonably believe that more employment would result from diversified manufacturing and similar industrial activity than from the tank storage of petroleum. Further, there was a showing of reason in the municipal fear that domination of this area by tank farms would constitute a substantial aggravation of the local traffic problem. The trial court found that Tidewater's projected figures as to the traffic its storage facilities would involve was not an appreciable increase over the present traffic. But a determination as to the traffic implications of the zoning problem cannot be limited to a consideration of only the effect of Tidewater's proposed activity, for if the zoning ordinance is struck down the door would be open for the establishment of other petroleum storage facilities in Zone B. The fact that Tidewater may have shown that its traffic alone would not add appreciably to that which it would replace is not sufficient to overcome the presumption of reasonableness which attaches to the borough's determination that the traffic which would result from the operation of all expectable petroleum storage facilities in the general area, if open to all, would be burdensome. Cf. Cobble Close Farm v. Bd. of Adjustment Middletown Tp., 10 N.J. 442, 451-53 (1952).
In all the foregoing respects the judiciary is not to weigh the evidence as to the factors militating for one zoning course of action rather than another. If there is any reasonable basis at all grounded in the statutory zoning considerations, for the municipal decisions of policy and classification reflected in the ordinance, they are to be respected by the courts.
*539 We thus conclude that the basic zoning decisions reflected by the May 1963 ordinance as to land uses in the heavy industrial zones of Carteret (with the June 1964 modification) represent a valid exercise of the zoning power of the municipality.
Plaintiffs argue by supplemental memorandum, however, that the June 1964 amendment of the zoning ordinance adds still further illegalities to the ordinance. Specifically, they assert that the only difference in the amendments is that
"industries now prohibited in the B Zone, viz., the storage and refining of the basic petroleum products, do not now operate in the B zone of Carteret. * * * But the exclusion of the now prohibited industries from the B Zone bears no substantial relation to the zoning purposes of [R.S. 40:55-32]. There is no reasonably conceivable basis of fact, under our zoning statute or under the general police power of municipalities, that can justify prohibiting such industries while at the same time permitting in the same zone the manufacturing and blending of the same basic petroleum products, and the storage, manufacturing, refining and blending of any of the volatile, flammable or inflammable and explosive components and derivatives of the basic petroleum products." (Emphasis theirs)
Plaintiffs stress the fact that uses which are potentially more dangerous, such as the storage or manufacture of explosives, may be approved under the ordinance if the proponents thereof satisfy the zoning board that the particular operation can be conducted without danger to or adverse effect upon properties in any residential or commercial zone, but that under no circumstances could a proponent of petroleum tank storage facilities even have the opportunity of proffering proof as to those issues. "Here," they argue, "lies the discrimination."
There is no merit in the argument. It is elementary that in any police power measure the legislative body may strike at the evil where it deems it worst, and it need not root out all harms in order to validly proscribe some. Here, after reflection during the course of this litigation, the municipality has presumptively concluded that there is no substantial zoning harm in permitting relatively small, diversified *540 industrial operations in Zone B, notwithstanding they involve handling petroleum derivatives of inflammable or explosive quality. The zoning dangers or public inconvenience of clusters of gigantic petroleum storage facilities may be attended to by the municipality without judicial interference based upon any notion that inadequate attention is being paid by the municipality to other alleged zoning evils. Cf. Morris v. Postma, supra, 41 N.J., at p. 361.
Finally, we point out that the June 1964 amendment also eliminated that feature of the 1963 ordinance which affirmatively authorized expansion of nonconforming uses in Zone B and was properly criticized in the opinion of the trial court.
Since we find that the ordinance as it now stands is entirely valid, we remand the cause to the trial court with directions to enter judgment in favor of the municipality. No costs.