FRANCIS J. KOZESNIK AND LAWRENCE E. BENSON, PLAINTIFFS-APPELLANTS, v. TOWNSHIP OF MONTGOMERY AND MINNESOTA MINING AND MANUFACTURING COMPANY, DEFENDANTS-RESPONDENTS.

CHARLES F. SLOVER AND NANETTE T. SLOVER, PLAINTIFFS-APPELLANTS, v. TOWNSHIP OF MONTGOMERY AND MINNESOTA MINING AND MANUFACTURING COMPANY, DEFENDANTS-RESPONDENTS.

JAMES A. DEPEW, MADELINE H. DEPEW, CHARLES L. FONTANA, JANE L. FONTANA, WALTER H. TAVENER, ELIZABETH A. TAVENER, JOSEPH A. LYNCH, ELSIE A. LYNCH, HENRY W. PETERS, HELEN R. PETERS, VINCENT J. PASCUCCI, MURIEL G. PASCUCCI, CHARLES F. SLOVER AND NANETTE T. SLOVER, PLAINTIFFS-APPELLANTS, v. TOWNSHIP OF HILLSBOROUGH, A MUNICIPAL CORPORATION; RICHARD VAN DOREN, DAVID W. AMERMAN AND RICHARD MUSA, MEMBERS OF THE TOWNSHIP COMMITTEE; MINNESOTA MINING AND MANUFACTURING COMPANY; HENRY JOHANSON, BUILDING INSPECTOR; AND A. Y. TAYLOR, ZONING OFFICER, DEFENDANTS-RESPONDENTS.

Argued January 21, 1957—Decided April 8, 1957.

156

Mr. *Ralph S. Mason* argued the cause for plaintiffs-appellants Francis J. Kozesnik and Lawrence E. Benson (*Messrs. Mason & Griffin,* attorneys).

Mr. *William Ozzard* argued the cause for plaintiffs-appellants Charles F. Slover and Nanette T. Slover (*Messrs. Beekman & Ozzard,* attorneys).

Mr. *Fred G. Stickel, III,* argued the cause for defendant-respondent Minnesota Mining and Manufacturing Company (*Messrs. Stickel & Stickel,* attorneys; *Mr. Fred G. Stickel, III,* of counsel).

Mr. *George W. Allgair* argued the cause for defendant-respondent Township of Montgomery (*Messrs. George W. Allgair* and *A. Dix Skillman,* attorneys; *Mr. George W. Allgair,* of counsel).

Mr. *David D. Furman* argued the cause for the Attorney-General as intervenor (*Mr. Grover C. Richman, Jr.,* Attorney-General of New Jersey; *Mr. David D. Furman,* Deputy Attorney-General of New Jersey, of counsel).

Mr. *Willard G. Woelper* argued the cause for plaintiffs-appellants James A. Depew, *et als.* (*Messrs. Toner, Crowley, Woelper & Vanderbilt,* attorneys; *Mr. Willard G. Woelper,* of counsel; *Mr. Robert A. Matthews,* on the brief).

Mr. *George W. Allgair* argued the cause for defendants-respondents Township of Hillsborough, *et als.* (*Mr. George W. Allgair,* attorney for and of counsel with defendants-respondents).

The opinion of the court was delivered by

WEINTRAUB, J. Plaintiffs challenge the validity of amendments to the zoning ordinances of the Township of Hillsborough and the Township of Montgomery. The trial court upheld the measures. On our own motion we certified appeals prosecuted to the Appellate Division.

Early in 1953 Minnesota Mining and Manufacturing Company (herein called 3M) informed the townships of the existence of diabase rock of unusual quality in the Sourland Mountain, and asked for amendments of their respective ordinances to the end that it might quarry and process the rock for ultimate use as colored roofing granules. 3M proposed that a quarry and crushing plant be located in Hillsborough and the coloring plant in Montgomery, the granules to be carried from Hillsborough to the coloring plant in Montgomery by a conveyor system. The total operation would thus involve an integration of activities in the two townships.

Sourland Mountain is a prominent geographic feature of the townships. At the time of 3M's application, the areas here involved were zoned for agricultural or residential uses. The mountain has not lent itself to agricultural development and is much too rugged for exploitation for mass residential development, but is attractive for isolated custom home construction and some homes have been located in the mountain, although not within the zones ultimately established in response to 3M's application. There has been no utilization of the lands in the new zones within recent years.

Both townships are sparsely inhabited. In Hillsborough, which covers 54.7 square miles, the population in 1950 was 3,875 and in 1953 was 4,594. A portion of the township was set aside for industrial development, but failed to attract industry. The actual utilization of land consists, in addition to homes, of some commercial uses to meet local needs and some large governmental installations. Montgomery covers 31.8 square miles and its population totalled 3,819 in 1950 and 3,900 in 1954. Prior to the amendment in question its lands were zoned either for residential or business use.

Most of the land is used for farming. There were but 620 houses in the township in February 1954. The New Jersey Neuro-Psychiatric Institute at Skillman (which houses about 1,500 of the total population), a fertilizer packaging plant, a private sanatorium, a farm implement agency and a store, complete the story of land utilization in the township. There are no municipal services other than road construction and maintenance and police protection.

3M's decision to quarry in Hillsborough was dictated by the special quality of the diabase rock there found, the amount of overburden which would have to be removed, and the presence of an appropriate facing for quarrying which would obviate the more difficult and expensive pit-type operation. Montgomery was preferred as the site for the coloring plant because of easier access to existing railroad facilities. It was contemplated that about 90% of the granules would move by rail and the balance by truck.

3M's application excited great local interest. After extensive public debate, both townships made the legislative decision to rezone in harmony with 3M's request in December 1953. A complaint in lieu of prerogative writ was filed against each municipality. The Montgomery suit resulted in the judgment here under review. Prior to trial, Hillsborough repealed its amendatory ordinance pursuant to what was accepted as a verdict at the polls, and the action against it was accordingly dismissed. On February 24, 1955, again after a local election, the ordinance was reenacted and there followed the Hillsborough litigation now before us.

Although for reasons hereinafter expressed we feel compelled to set aside the amendatory ordinances of both townships, we are satisfied that the basic plan may lawfully be achieved. Our purpose here is to consider those objections, valid and invalid, which will bear upon the course the municipalities may take if they should determine to further the program.

There of course is nothing invidious in the circumstance that the townships cooperated in a matter of common

interest. On the contrary, municipalities are concerned with land utilizations abutting their lines, and hence a concurrent effort to integrate them serves the objective of our zoning statute. *Borough of Cresskill v. Borough of Dumont,* 15 *N. J.* 238 (1954); *Duffcon Concrete Products, Inc., v. Borough of Cresskill,* 1 *N. J.* 509 (1949); *Bassett, Zoning* (1940), *p.* 92.

## THE HILLSBOROUGH ORDINANCE

Hillsborough amended its ordinance to create a limited industrial zone wherein it authorized residential and agricultural uses as theretofore and additionally permitted "Quarries." The ordinance conditions the right to quarry upon the issuance of a permit by the township committee upon an application to be referred to the planning board for review and report thereon. Standards are prescribed of which the following may be noted:

(1) No quarry shall be conducted on less than 200 contiguous acres within the zone.

(2) Both a quarry and a processing plant shall not be conducted on less than 400 contiguous acres within the zone.

(3) No part of any of the use, except a railroad spur and approved access roads, shall be (a) within 100 feet from a boundary of the zone, or (b) within 400 feet from the nearest right-of-way "of any public road or highway now maintained by public authority," or within 400 feet "from any dwelling existing at the introduction of this Ordinance."

(4) No quarry excavating shall be done within 500 feet "from any such zone boundary or right-of-way line," nor within 1,000 feet "from any such dwelling," provided that the distance limitation with respect to any such zone boundary shall not apply if the boundary is contiguous to a boundary of a zone in which quarrying or processing of quarry products or both is permitted in an adjoining municipality.

Further provisions with appropriate standards give added assurance of safe operation.

The ordinance provides that "No quarry shall be permitted whose primary use of the product extracted shall be the sale of the extracted product in an unprocessed state for

road building or the manufacture of concrete." This restriction is intended to confine quarrying to rock having sufficient value to bear the cost of the protective measures required under the ordinance to safeguard the public interest and apparently as well to preclude general quarrying which would lead to substantial trucking operations through the community to meet relatively local demands. In short, the ordinance is so framed that for all practical purposes the industrial activity authorized is pinpointed to the extraction and processing of diabase rock for limited ultimate use.

Various challenges are bottomed upon *R. S.* 40:55-32, which reads:

"Such regulations shall be in accordance with a comprehensive plan and designed for one or more of the following purposes: to lessen congestion in the streets; secure safety from fire, panic and other dangers; promote health, morals or the general welfare; provide adequate light and air; prevent the overcrowding of land or buildings; avoid undue concentration of population. Such regulations shall be made with reasonable consideration, among other things, to the character of the district and its peculiar suitability for particular uses, and with a view of conserving the value of property and encouraging the most appropriate use of land throughout such municipality."

I.

Plaintiffs contend the amendment is not "in accordance with a comprehensive plan." There are a number of facets to this attack. The first is that there can be no comprehensive plan unless it is evidenced in writing *dehors* the zoning ordinance itself.

Hillsborough has not adopted a master plan under the Planning Act, *R. S.* 40:55-1 *et seq.*, superseded on January 1, 1954, by the Municipal Planning Act (1953), chapter 433 of the *Laws of* 1953, *N. J. S. A.* 40:55-1.1 *et seq.*

The former Planning Act authorized but did not require the creation of a planning board and the adoption of a

master plan. *R. S.* 40:55–3 and 6. The present Planning
Act repeats this permissive approach. *N. J. S. A.* 40:55–1.4
and 1.10. Neither the former nor the present act provides
that a master plan shall precede the adoption or amendment
of a zoning ordinance. On the contrary, the Zoning Act
initially provided for the formation of a zoning commission
to recommend a zoning ordinance, *R. S.* 40:55–33, and ex-
pressly stated that an amendment of the ordinance was
beyond even that provision. An amendment of that section
in 1948 provides the planning board may be used instead
of a zoning commission, and the same amendatory statute
provides an amendment of a zoning ordinance shall not
become effective unless the ordinance proposing it shall first
have been submitted to the planning board. *R. S.* 40:55–35,
as amended. But the statutes do not say that a master
plan is prerequisite to zoning action.

No doubt good housekeeping would be served if a zoning
ordinance followed and implemented a master plan, *Haar,
"In Accordance with a Comprehensive Plan," 68 Harv. L.
Rev.* 1154 (1955), but the history of the subject dictated
another course. Initially regulations concerning land use
were merely prohibitory or restrictive with respect to specific
noxious or dangerous activities. Thereafter a more com-
prehensive approach developed in the form of zoning, having
as its purpose the creation of districts with regulations as
to construction and use, including regulations as to height,
number of stories, sizes of buildings, percentage of lot that
may be occupied, sizes of yards, courts, *etc. R. S.* 40:55–30.
Finally came the Planning Act, which envisions the de-
velopment of a plan looking to and guiding future develop-
ment with provision for the location of public improvements,
control over subdivisions, and the like. For a discussion
of the relation of zoning to planning see *Mansfield & Swett,
Inc., v. Town of West Orange,* 120 *N. J. L.* 145 (*Sup. Ct.*
1938).

Thus the historical development did not square with the
orderly treatment of the problem which present wisdom
would recommend. And doubtless the need for immediate

measures led the Legislature to conclude that zoning shall not await the development of a master plan. Accordingly, as of October 15, 1954, while there were 371 zoning ordinances in our State, there were 320 planning boards and but 112 master plans. Professor Haar states that for the most part zoning elsewhere has preceded planning and about one-half of the cities with comprehensive zoning ordinances have not adopted master plans. *Haar, "In Accordance with a Comprehensive Plan," supra* (68 *Harv. L. Rev.*, at 1157).

It is thus clear that the "comprehensive plan" of the zoning statute is not identical with the "master plan" of the Planning Act and need not meet the formal requirements of a master plan. The Zoning Act nowhere provides that the comprehensive plan shall exist in some physical form outside the ordinance itself. The question therefore is whether that requirement inheres in the very nature of a "comprehensive plan."

There has been little judicial consideration of the precise attributes of a comprehensive plan. *Haar, "In Accordance with a Comprehensive Plan," supra* (68 *Harv. L. Rev.* 1154). Our own decisions emphasize that its office is to prevent a capricious exercise of the legislative power resulting in haphazard or piecemeal zoning. *Speakman v. Mayor and Council of Borough of North Plainfield,* 8 *N. J.* 250, 256 (1951); *Raskin v. Town of Morristown,* 21 *N. J.* 180, 198 (1956). Without venturing an exact definition, it may be said for present purposes that "plan" connotes an integrated product of a rational process and "comprehensive" requires something beyond a piecemeal approach, both to be revealed by the ordinance considered in relation to the physical facts and the purposes authorized by *R. S.* 40:55–32. Such being the requirements of a comprehensive plan, no reason is perceived why we should infer the Legislature intended by necessary implication that the comprehensive plan be portrayed in some physical form outside the ordinance itself. A plan may readily be revealed in an end-product—here the zoning ordinance—and no more is required by the statute.

The comprehensive plan embraced by an original zoning ordinance is of course mutable. If events should prove that the plan did not fully or correctly meet or anticipate the needs of the total community, amendments may be made, *Hochberg v. Borough of Freehold,* 40 *N. J. Super.* 276 (*App. Div.* 1956), and if the ordinance as thus amended reveals a comprehensive plan, it is of no moment that the new plan so revealed differs from the original one.

## II.

It is asserted the authorization to quarry and process rock is incompatible with the purposes set forth in *R. S.* 40:55–32, and hence not part of a "comprehensive plan."

The zoning statute delegates legislative power to local government. The judiciary of course cannot exercise that power directly, nor indirectly by measuring the policy determination by a judge's private view. The wisdom of legislative action is reviewable only at the polls. The judicial role is tightly circumscribed. We may act only if the presumption in favor of the ordinance is overcome by a clear showing that it is arbitrary or unreasonable. *Schmidt v. Board of Adjustment of City of Newark,* 9 *N. J.* 405, 416 (1952); *Cobble Close Farm v. Board of Adjustment of Middletown Tp.,* 10 *N. J.* 442, 451 (1952); *Yanow v. Seven Oaks Park, Inc.,* 11 *N. J.* 341, 360 (1953); *Pierro v. Baxendale,* 20 *N. J.* 17 (1955).

Nothing in the zoning statute intimates that natural resources may not be tapped. The power to authorize quarrying and processing of rock must surely exist, and the Planning Act of 1953 lists "mining" and "other like matters" within the scope of proposals for a master plan. *N. J. S. A.* 40:55–1.11. Hence the issue is whether Hillsborough's determination that its welfare would be advanced by the action it took must be condemned on the standard which controls judicial review.

There assuredly are considerations *pro* and *con.* On the plus side are the economic gains to the municipality conse-

quent upon the industrial activity, including substantial tax revenues in an area which has had a fairly high incidence of tax delinquency; the benefit to the vicinity, State and eastern part of our Nation from access to the natural resource; the circumstance that the property is peculiarly suitable for the particular use and that the amendment authorizes the most appropriate use of the lands involved, a purpose which the statute encourages so long as it is not incompatible with total local welfare.

On the minus side appear a number of considerations, the evaluation of which is sharply disputed. The statute commands that the regulations be made "with a view of conserving the value of property and encouraging the most appropriate use of land throughout" the municipality. The record well supports a finding that by reason of the rural nature of the community and the remoteness of the site, the impact upon property values in other districts will be slight. There will be some increase in traffic, as of course inevitably follows any utilization of land, but the increase will be moderate. There will be no appreciable hazard from fire or panic, or overcrowding of land or buildings, or undue concentration of population. There inheres in quarrying an element of annoyance from sound and concussion, but state legislation and provisions of the ordinance itself serve to confine it. Dust will be emitted but again the testimony justifies a finding that the pollution will not be significant in the light of available techniques. There will be some esthetic impairment of a mountain of unquestioned beauty.

We are not confronted with the question whether any or all of the foregoing would justify a refusal to permit the quarrying operation. Rather, the question is whether we can say that Hillsborough's decision to permit it has been shown to be arbitrary or unreasonable. It seems to us that the amendment presented a fairly debatable issue, and hence we cannot interfere with the legislative judgment that the purposes of *R. S.* 40:55–32 will be served and that the authorization of the industrial use is appropriately a part of the comprehensive plan.

## III.

It is urged that if quarrying is permitted, it is arbitrary to exclude other industrial uses and so-called "higher" uses, such as commercial ones.

We are not unmindful that in the infancy of zoning it was the general practice to permit higher uses in the less restricted district. The statute, however, does not so command. Rather, it broadly permits any reasonable scheme which comports with the legislative standards and thus leaves ample room for new ideas. Experience has satisfied many that, for example, homes are no more appropriate in an industrial district than industry in a residential one. In both situations the baleful influences upon residences are the same. Moreover, industry may prefer to avoid the frictions which ensue when discordant uses are side by side. Hence, in seeking a well-balanced community, *Berdan v. City of Paterson*, 1 *N. J.* 199 (1948), a municipality may conclude its welfare is better served by avoiding motley activities within its districts. See *Roney v. Board of Supervisors of Contra Costa County*, 138 *Cal. App.* 2d 740, 292 *P.* 2d 529 (*Ct. App.* 1956). In every case the question is one of reasonableness under the circumstances. The point sufficient for the present is that there is no rule of law, statutory or constitutional, which ordains that any use has an exalted position in a zoning scheme entitling it to move everywhere as of right.

The problem is the familiar one of classification. Thus where the facts were found to demonstrate that it was unreasonable to exclude commercial activity from a light industrial district, the restriction was held invalid, *Katobimar Realty Co. v. Webster*, 20 *N. J.* 114 (1955), whereas when a reasonable basis existed for differentiating between motels and boarding or rooming houses, the exclusion of the former was upheld. *Pierro v. Baxendale, supra* (20 *N. J.* 17). In both cases this court divided 4 to 3, but the division did not reflect disagreement as to basic principle but rather as to the application of the principle to the facts of the case.

It should be noted that we do not have before us the question whether over objection of an owner his property may be zoned solely for one specific use. See for example *Vernon Park Realty Inc. v. City of Mt. Vernon,* 307 *N. Y.* 493, 121 *N. E. 2d* 517 (*Ct. App.* 1954), where a parcel was zoned solely for automobile parking and a service station, and *McCarthy v. City of Manhattan Beach,* 41 *Cal. 2d* 879, 264 *P. 2d* 932 (*Sup. Ct.* 1953), *certiorari* denied 348 *U. S.* 817, 75 *S. Ct.* 29, 99 *L. Ed.* 644 (1954), where property was zoned solely for beach recreational purposes. Here the property in the limited industrial district may continue to be used for residential and agricultural purposes, the ordinance merely authorizing the additional activity here challenged. Hence, the question is whether the quarrying operation may constitute a class apart from other industrial activities and be the sole such activity permitted in addition to agricultural and residential uses.

 Ordinarily a single industrial activity would not constitute a defensible class, but the proposition is general and not universal. It is true that where a municipality determines a district is suitable for general industrial uses, it may not reserve the power to decide upon individual applications which industrial uses will be admitted. *Rockhill v. Township of Chesterfield,* 23 *N. J.* 117 (1957). Such, however, is not the situation before us. Hillsborough did not conclude that the area in question could advantageously be devoted to general industrial development. It found to the contrary and authorized quarrying operations solely because the natural resource was there.

There are a number of considerations which justify a decision to admit this industrial activity and no other. The determination to authorize quarrying operations in itself involved a nice balancing of advantages against detriments. If, however, all industrial uses were permitted, the total impact upon the abutting areas might be such that the point of diminishing returns would quickly be reached and passed. For one thing, the rock area does not now have local services such as water, sewage disposal, fire or police

protection, or improved roads. Quarrying can be conducted without expense to Hillsborough in these respects, whereas other industrial activities might well need these local services at a forbidding cost. It is difficult to conceive of other industry being attracted to that terrain, but if it would, yet other areas are better suited for it and are so zoned. Hillsborough is entitled to encourage industry where it will best advance the community's interest. It would be unreasonable to say it may exploit natural resources only if it was willing to accept the burden of all industrial activity in a place where general industry does not belong. We see no reason for an all-or-nothing proposition.

It may be that there is some other specific industry which could co-exist harmoniously with quarrying and without generating appreciable problems. But the validity of a legislative classification may not be impugned on the basis of attenuated possibilities; otherwise the power to classify would be hampered beyond usefulness. If it should ever appear that another specific use is compatible and desirous of moving into the district, it will then be time enough to consider whether it is arbitrary to exclude it. *Cf. Euclid, Ohio v. Ambler Realty Co.,* 272 *U. S.* 365, 395, 47 *S. Ct.* 114, 71 *L. Ed.* 303 (1926).

We have heretofore recognized the propriety of the classification of a single use upon a finding of unique capacity for harmful influence in the light of the objectives of the zoning law. Thus, it has been held that a municipality may deal separately with gasoline service stations and may provide that they may not be erected as of right anywhere within its limits but rather shall be permitted only upon individual application to be considered upon an appropriate standard. *Schmidt v. Board of Adjustment of City of Newark, supra* (9 *N. J.* 405). It may be added that Hillsborough could have utilized this technique in the present situation. It, however, was not obliged to approach the problem in that way. Being in a position to make the legislative decision without recourse to further factual findings, the governing body could itself directly fix the precise site upon its own

determination as to where quarrying may be conducted advantageously and without overriding hurt to the public welfare. For reported instances in which authorization of a single use has been upheld, see *Higbee v. Chicago, Burlington & Quincy R. Co.*, 235 *Wis.* 91, 292 *N. W.* 320, 128 *A. L. R.* 734 (*Sup. Ct.* 1940), where an ordinance authorizing a passenger depot was upheld, and *Holt v. City of Salem*, 192 *Or.* 200, 234 *P. 2d* 564 (*Sup. Ct.* 1951) in which an ordinance permitting the erection of a substation for the distribution of electric power was sustained.

## IV.

The ordinance is attacked as "spot zoning."

The testimony discloses that the diabase rock extends far beyond the limits of the new district, and this being so, plaintiffs seek application of the general proposition that all property in like circumstances should be treated alike. *Beirn v. Morris*, 14 *N. J.* 529, 535 (1954); *Kalobimar Realty Co. v. Webster, supra* (20 *N. J.*, at *page* 123); *Raskin v. Town of Morristown, supra* (21 *N. J.*, at *page* 193); *Roselle v. Wright*, 21 *N. J.* 400, 409 (1956). We again have a general proposition which must yield to realities.

Dissimilar treatment does not inevitably bespeak capriciousness. If all property similarly situated had to be accorded identical treatment, the objective of a well-balanced community might be frustrated. If the public welfare is found to lie in the creation of a number of districts for various uses, lines must be drawn somewhere, and it may well happen, especially in rural areas, that little will distinguish properties on both sides of a given line. The final test must be whether the municipality is seeking to advance the community interest rather than some private or sectional advantage. *Raskin v. Town of Morristown, supra* (21 *N. J.* 180).

Here, in fact, the circumstance that diabase rock may be found in a wide area gives only a superficial ap-

pearance of uniformity of conditions. A number of considerations justify a decision to zone less than all of the rock-bearing region. The evidence indicates that the portion here selected had unique advantages apart from the special quality of the rock, namely, a lesser quantity of overburden coupled with suitable facings for quarrying. Additionally, Hillsborough was entitled to decide how much of its area could be subjected to the impact of these operations consistent with its total interest. Some quarrying may redound to the general welfare; too much of it may cast a pale on the entire community. Moreover, there are homes in the mountain beyond the limited industrial zone. It is admissible to conclude that the remaining mountainous terrain should stand between the limited industrial district and areas found suitable for other uses. These factors amply sustain a legislative determination to limit the district.

More troublesome is the manner in which the precise boundaries were here fixed. Defendants urge the boundaries relate to existing features and hence are appropriate. Two sides were fixed in relation to public roads at least for part of their course, a third follows a pipeline which lies slightly within the zone, and the fourth is the line separating Hillsborough from Montgomery.

Plaintiffs emphasize the fact the ordinance conforms to 3M's proposal. That it does, is not in itself a vitiating circumstance. Nor does the ownership of property nor its size constitute the controlling test of so-called spot zoning. If the purpose is solely to serve the private interests of the owner, there is a perversion of power, but if the intention is to further the welfare of the entire municipality as part of a comprehensive plan (and we have said that a legislative finding to that effect must here be upheld), it is of no moment that private interests are simultaneously benefited. *Speakman v. Mayor and Council of Borough of North Plainfield, supra* (8 N. J. 250); *Conlon v. Board of Public Works of City of Paterson,* 11 N. J. 363 (1953); *Borough of Cresskill v. Borough of Dumont, supra* (15 N. J. 238); *Campbell v. Borough of Hillsdale,* 12 N. J. *Super.* 182 (*App.*

*Div.* 1951); *Closterman v. Township of Cranford,* 22 *N. J. Super.* 204 (*App. Div.* 1952); *Hochberg v. Borough of Freehold, supra* (40 *N. J. Super.* 276); *Crow v. Town of Westfield,* 136 *N. J. L.* 363 (*Sup. Ct.* 1948); *Plass v. Town of Bloomfield,* 134 *N. J. L.* 580 (*Sup. Ct.* 1946); *Rodgers v. Village of Tarrytown,* 302 *N. Y.* 115, 93 *N. E. 2d* 731 (*Ct. App.* 1951).

Plaintiffs say the township did not exercise its independent judgment with respect to the boundaries. The record does suggest that the planning board accepted 3M's proposal without express discussion as to whether the district should be larger or smaller. This fact might be of compelling force in other circumstances, but here Hillsborough was dealing with relatively wild and unused lands, rather than with a developed area in which the precise location of lines would have particular significance. The decisive factors were the location of the desirable rock, the ease of access to it, and such limitation upon the area of quarrying activity as would avoid an adverse effect upon the whole community. Whatever lines were to be drawn, they necessarily would be rough and approximate. Plaintiffs do not demonstrate the lines as drawn are affirmatively inappropriate or that some other lines would be more sensible. Hillsborough's own expert approved 3M's recommendation which itself was supported by a planning expert 3M engaged. In these circumstances we cannot say that the ordinance is invalid because of the absence of open discussion as to whether the area should have been larger or smaller, especially in the absence of facts indicating that such discussion would have been fruitful in any way.

But plaintiffs say that if the zone itself is properly fixed, yet it is arbitrary to include therein lands which cannot meet the minimum requirements for a quarrying permit.

The district embraces 950 acres, of which 3M controls 684.32 acres. It will be recalled that a permit may not issue for quarrying unless the applicant holds 200 contiguous acres and that 400 contiguous acres are required for both quarrying and rock processing. 3M claims to have

400 contiguous acres, but it is stipulated that the properties owned by others are so situated that 200 contiguous acres could not be assembled. In short, only 3M can quarry and the remaining acreage could so be utilized only if sold to 3M.

If the design were to compel a sale to 3M, the invalidity of the ordinance would be indisputable. But although the mentioned facts invite circumspection, yet the reasonableness of the acreage requirements were not challenged by any proof and we cannot reject the affirmative evidence that they are intended to safeguard the public. If the ordinance committed all of the district to the industrial use alone and thus prevented any utilization of the acreage not owned by 3M, a far different question would be presented. But these lands remain zoned as heretofore for residential and agricultural uses. Hence the challenge falls unless the uses so purportedly authorized are in fact unreasonably hindered by the play of other terms of the ordinance. And this leads us to the feature which we feel requires the ordinance to be set aside.

 Hillsborough manifestly found that quarry operations hold a significant potential for deleterious influence upon the enjoyment of neighboring property. This is at least one basis of the acreage requirement and is the basis of the restrictions recited at the outset of this opinion fixing certain distances between phases of the operations and homes. The difficulty is that protection is afforded only for "any dwelling *existing at the introduction of this ordinance.*" The owners of the remaining acreage are entitled to like protection to the end that the authorized uses may reasonably be pursued. The record does not clearly reveal the precise location of the parcels not controlled by 3M. We gather there are five such parcels, of which four are unimproved (the fifth, owned by plaintiffs, Slover, is largely in another zone with a small triangular rear portion jutting into the limited industrial zone). The exact location of 3M's holdings was frankly obscured for private reasons not here pertinent. But whatever the physical relation of the other parcels to 3M's, it is plain that under the

ordinance 3M could carry on its activities within the very distances of those parcels which Hillsborough has found to be necessary to protect housing use.

We are not here concerned with that incidental and unremediable loss of value which is inevitably experienced by property abutting another zone in which lesser uses are authorized and which must be accepted for the common good. *Guaclides v. Borough of Englewood Cliffs,* 11 *N. J. Super.* 405, 414 (*App. Div.* 1951); *Gross v. Allan,* 37 *N. J. Super.* 262, 270 (*App. Div.* 1955). Rather, we have a situation in which some property owners are required for the special benefit of another proprietor to absorb part of the burden of an industrial use of acknowledged capacity to harm, and this upon the irrelevant circumstance whether their properties are or are not improved at the time of the introduction of the ordinance. The imposition is unreasonable and the classification arbitrary.

It is true that where a nuisance results, it is no defense that the zoning ordinance authorized the operation and hence judicial relief may be had. *Kosich v. Poultrymen's Service Corp.,* 136 *N. J. Eq.* 571, 584 (*Ch.* 1945). Nonetheless, when a zoning ordinance is being prepared, and as here the potential nuisance is recognized unless the operation be isolated, the ordinance should require the quarry operator to provide the necessary buffer and not cast the burden on the neighboring owner. If the ordinance expressly said that a property owner may not improve his land within a given distance of the quarry or processing plant, the appropriation of his property for the benefit of the quarry operator would be apparent. *Cf. Raskin v. Town of Morristown, supra* (21 *N. J.* 180). Principle is no less offended when the ordinance purports to place the burden upon the quarry operator but as a practical matter transfers it to neighboring owners who, while ostensibly permitted to utilize their properties, must provide their own setbacks or experience an exposure capable of hindering enjoyment. Whatever the reasonable distances may be, they

should be measured from adjoining property lines whether or not the parcels are now improved.

We appreciate the lands are of marginal quality. Yet we cannot assume that their owners have the single prospect of paying taxes. Perhaps their marginal character requires all the more that reasonable protection be afforded. At any rate, in sustaining the acreage requirements despite the circumstance that the other owners may not quarry, we assumed with defendants that those other properties are in fact usable for the other authorized purposes and are not legislated into idleness. We cannot discard that assumption in measuring the reasonableness of the aspect we are now considering.

Defendants question the status of plaintiffs to challenge the validity of the ordinance, urging that if the ordinance is invalid as to any parcel, it concerns only that owner and he may not attack it until he has exhausted his administrative remedy before the board of adjustment. This proposition will be discussed below in connection with the Montgomery matter. Here, however, the challenge involves the entire district because the unreasonableness lies not in the inclusion within the district of the five parcels held other than by 3M but rather in the failure so to condition quarrying activities as to afford proper protection for other properties. The administrative remedy could not overcome the infirmity. And we need not stop to consider the *quantum* of detriment to the Slovers (the only property owners within the limited industrial district who are parties plaintiffs), since we have recognized a broad right in taxpayers and citizens of a municipality to seek review of local legislative action without proof of unique financial detriment to them. *Driscoll v. Burlington-Bristol Bridge Co.,* 8 *N. J.* 433, 476 (1952); *Garrou v. Teaneck Tryon Co.,* 11 *N. J.* 294, 302 (1953); *Koch v. Borough of Seaside Heights,* 40 *N. J. Super.* 86, 93 (*App. Div.* 1956), affirmed 22 *N. J.* 218 (1956); *Haines v. Burlington County Bridge Commission,* 1 *N. J. Super.* 163, 171 (*App. Div.* 1949). The community-at-large has an interest in the integrity of the zoning plan,

*Beirn v. Morris, supra* (14 *N. J.*, at *page* 536), sufficient to justify an attack which goes to the validity of the entire district.

▮ It is here appropriate to refer briefly to plaintiff's contention that Barber Hill Road should receive the same protection which the ordinance gives to "any public road or highway now maintained by public authority." Barber Hill Road is a mere paper way, never maintained, not traversable by ordinary conveyances, and in fact not used in Hillsborough except at its terminus where it is privately maintained for a distance of some 150 feet (entirely or mostly in another zone) for the convenience of the Slovers whose home is there situated. We are satisfied that Barber Hill Road is not a reality within the limited industrial zone and hence that the township's decision that it does not and will not need protection is unassailable.

## V.

Two other questions should be considered since they bear upon the course Hillsborough may take if it chooses to enact another ordinance.

Plaintiffs say Barber Hill Road, which bisects 3M's holdings, thereby operates to deny contiguity to the 400 acres 3M needs for a permit. The issue is solely one of intention and hence can be resolved in drafting a new ordinance.

▮ Plaintiffs further contend that authority may not be delegated to the planning board to consider an application for a permit and report thereon to the governing body, and insist that only the board of adjustment may be employed for that purpose. We see no merit in this objection. The legislative decision as to what use should be permitted was fully made in the ordinance. What is referred to the planning board is the determination not merely of the existence of the required acreage but more importantly of the sufficiency of the proposal in the application to assure safe operation on the basis of the standards in the ordinance. The planning

board is a singularly appropriate agency since the matters thus referred · are cognate to the purposes of municipal planning, *N. J. S. A.* 40:55–1.12, and express statutory authority exists for the reference. *N. J. S. A.* 40:55–1.13.

## The Montgomery Ordinance

Montgomery adopted its zoning ordinance on May 25, 1940, and as amended on March 4, 1941, it divided the township into residential districts and business districts. In June 1951 Montgomery retained the Institute of Local and State Government of the University of Pennsylvania to assist in the preparation of a master plan and the revision of the ordinance. There were numerous meetings of the planning board to consider recommendations but nothing had been finalized when 3M submitted its proposal in January 1953. The Institute had prior thereto recommended that quarrying be permitted in the region here involved on the basis of special exception rather than as an authorized use, which proposal had not been accepted as of the time of the advent of 3M.

The ordinance as finally adopted and now before us substantially revised the existing ordinance and created five classes of districts: (1) agricultural, (2) rural residence, (3) commercial, (4) manufacturing, and (5) limited industrial. One limited industrial district was created embracing 450 acres. On the west it abuts the limited industrial district in Hillsborough. To the north and south of it are agricultural districts. On the east are rural residential districts, between which the limited industrial zone extends as a corridor leading to the Pennsylvania and Reading Railroad facilities.

I.

Plaintiffs charge the ordinance was not adopted in accordance with *R. S.* 40:55–33, which deals with the adoption of an original zoning ordinance as distinguished from an amendment. The point made is that the ordinance is

so extensive in its operative effect that it should be deemed to be governed by the statutory provisions relating to an original ordinance. The trial court concluded that if the premise be granted, nonetheless there was substantial compliance, although it deemed the ordinance to be an amendment and hence within the purview of *R. S.* 40:55–35, as amended.

The insistence that the ordinance be treated as an original rather than an amendatory one is sought to be buttressed by the fact that the zoning amendment of 1927 to the Constitution of 1844, *Art.* IV, § VI, *par.* 5, did not refer to regulation of land uses, whereas the 1947 Constitution does, *Art.* IV, § VI, *par.* 2, and was implemented accordingly by legislation in 1948, including the amendment of *R. S.* 40:55–33. In our State there was initially a narrow judicial concept of the capacity of the police power to deal with the zoning problem, and the amendment in 1927 of the Constitution of 1844 resulted. It has since been recognized that the police power at all times embraced authority to zone, and hence further constitutional expression was unnecessary. The inclusion in the provision of the Constitution of 1947 of a reference to the use of land perhaps was intended to eliminate any doubt as to whether the power extended to the use of land itself. The constitutional provisions, however, merely confirmed an existing power and hence serve to govern the exercise of the power rather than as a source of it. *Schmidt v. Board of Adjustment of City of Newark, supra* (9 *N. J.* 405). Although the constitutional authority and legislative delegation to the municipality were thereby established to include regulation of the use of land, we cannot infer that the Legislature intended that all amendments of zoning ordinances made to exercise control over the use of land shall be deemed to constitute an original exercise of the power to zone. Amendments to that end constitute amendments and no more.

The Legislature distinguished between the enactment of a zoning ordinance and an amendment thereof. *R. S.* 40:55–33 expressly states that its provisions shall not apply

"to an amendment * * * of any zoning ordinance," and *R. S.* 40:55–35 provides that the "regulations, limitations and restrictions [of a zoning ordinance] may be amended, changed, modified or repealed, and the boundaries of such districts may be changed" in accordance with the terms of that section. We are now asked to hold that some amendments should be deemed to be original enactments upon an appraisal of the charges wrought. The Legislature has not suggested any limitation upon how much may be accomplished by amendment, and we are loath to complicate the scene by finding a limitation which would generate doubts and litigation.

There can be no quarrel with defendants' assertion that the entire program was well-aired publicly. There were some 22 meetings of the governing body and the planning board between January 23, 1953 and December 1, 1953 when the ordinance was finally passed. Of these meetings, 12 were public hearings and much testimony was offered. At most of the meetings of the planning board, all members of the governing body were present, two of them as members of the planning board.

As we understand plaintiffs' position, they do not urge that the terms of *R. S.* 40:55–35 were ignored. From our own examination we are satisfied they were fully met.

## II.

The limited industrial district is attacked as spot zoning intended solely for the private gain of 3M and not in furtherance of the public interest. Reliance is placed upon the fact that all the 450 acres within the district except 20 acres owned by Kozesnik are held by 3M, and upon proof offered by plaintiffs to support their thesis that the purposes of *R. S.* 40:55–32 are not served by permitting the processing of quarried rock. Nothing will be gained by a detailed discussion of the evidence for and against the legislative decision. We must conclude upon the basis of the principles applied hereinabove with respect to the Hillsborough ordi-

nance that the issue whether rock processing should be authorized was a debatable one for local determination and hence there is no basis for judicial intervention.

## III.

The Montgomery ordinance does not permit residential or agricultural use in the limited industrial district and hence, unlike the Hillsborough ordinance, authorizes but a single use, to wit:

"Processing of the products of a stone or rock excavating operation when such processing is *physically and operationally integrated with the extracting or quarrying use*" (Italics added)

and uses accessory thereto. Since quarrying is not permitted in Montgomery, the integration can only be with quarrying in Hillsborough. Thus the sole use permitted is conditioned upon affiliation with a quarrying operation elsewhere. 3M alone can meet the requirement.

It should be noted that we do not have before us the question whether a district may be restricted to a single specific use. There are but two owners of property within the district and neither raises the question. 3M does not complain; it in fact invited the restriction. Kozesnik presses a different attack which will be considered below. We of course recognize the community's interest in a zoning scheme, but here the suggested issue, if sought to be advanced on that basis, would be academic since there is no prospect that 3M would utilize its lands for any use other than the authorized use.

Kozesnik complains that his property cannot be put to the single authorized use since he cannot associate it with a quarrying operation in Hillsborough and hence the ordinance is invalid as to his property. It was frankly conceded before us that there is nothing he can do with his property. That a restraint against all use is confiscatory and beyond the police power and statutory authorization is too apparent to require discussion. *Grosso v. Board of Adjustment of*

*Tp. of Millburn,* 137 *N. J. L.* 630 *(Sup. Cl.* 1948) ; *Arverne Bay Construction Co. v. Thatcher,* 278 *N. Y.* 222, 15 *N. E.* 2d 587, 117 *A. L. R.* 1110 *(Ct. App.* 1938) ; 2 *Metzenbaum, Law of Zoning* (2d ed. 1955), *p.* 1416 *et seq.*

Defendants say, however, that Kozesnik may not attack the ordinance unless he first exhausts his administrative remedy before the board of adjustment. Reliance is placed upon *Fischer v. Township of Bedminster,* 11 *N. J.* 194 (1952) ; *Conlon v. Board of Public Works of City of Paterson, supra* (11 *N. J.* 363) ; *Clary v. Borough of Eatontown,* 41 *N. J. Super.* 47 *(App. Div.* 1956). See 1 *Metzenbaum, Law of Zoning* (2d ed. 1955), *p.* 708 *et seq.;* 58 *Am. Jur., Zoning,* § 244, *p.* 1069; *Annotation,* 136 *A. L. R.* 1378 (1941). A distinction was drawn in *Conlon* between an attack upon an ordinance in its entirety and an attack upon some provision of the ordinance or its application to a particular parcel, it being there said that in the former situation there need not be recourse to the administrative remedy but in the latter there must be because a judicial determination of invalidity would leave the parcel wholly unrestricted and permit the owner to put it to any use however incongruous it may be with other uses in the area (11 *N. J.,* at *page* 370).

Ordinarily the invalidity of an ordinance as to a small parcel will not vitiate the treatment of the entire district within which it is situated. *Cf. Fischer v. Township of Bedminster, supra* (11 *N. J.* 205–206) ; *H. Behlen & Bros. v. Mayor and Council of Town of Kearny,* 31 *N. J. Super.* 30, 35 *(App. Div.* 1954). This principle is applicable where it may reasonably be assumed that the local legislative body would have intended the district to remain as legislated notwithstanding such partial invalidity. Here, however, the physical circumstances are such that we cannot say with assurance that the township would have so intended. We are dealing with a fairly substantial parcel of 20 acres running for 1,250 feet along the common boundary of the limited industrial districts of both townships, with a portion of the limited industrial district lying above and below the

parcel along the mentioned boundary. Moreover, the ordinance provides that no processing plant or any use incidental thereto shall be located within 500 feet of a boundary of an agricultural or residential zone, thus evidencing, as in the case of the Hillsborough ordinance, a finding that the industrial operation has a potential for harmful influence requiring protection for other properties. Since Kozesnik's acreage is not within an agricultural or residential district, it is not afforded that protection, and we of course cannot amend the ordinance to provide it, even if we could somehow conclude that Montgomery would want an ordinance thus reframed. Hence, we must conclude that the ordinance is invalid insofar as it relates to the limited industrial district and leave it to the local legislative body to decide whether in the light of our conclusions it desires to adopt an amendatory ordinance not inconsistent therewith.

## IV.

The ordinance provides:

"The establishment, construction and operation of any use permitted in Special Industrial Districts shall be in accordance with a site plan, and any amendment thereof, approved by the Township Planning Board. No permit shall be issued by the Building Inspector for any use or construction permitted in Special Industrial Districts except in strict accordance with all conditions specified in such approval."

There follows a set of standards which a site plan must meet. The standards are as specific as the circumstances reasonably require and are intended to insure that the operations be conducted with the least possible harm. They are constitutionally adequate. *Ward v. Scott,* 11 *N. J.* 117 (1952).

*R. S.* 40:55-11, in effect when the ordinance was adopted, reads:

"The governing body may by ordinance provide for the reference of any other matter or class of matters to the planning board before final action thereon by the public body or officer having final authority thereon, with or without the provision that final action

thereon shall not be taken until the planning board has submitted its report thereon or has had a reasonable time to submit its report, which time shall be fixed by the ordinance."

One month after the adoption of the ordinance, this section was repealed by the Municipal Planning Act of 1953, which, however, incorporated the essence of *R. S.* 40:55–11 in *N. J. S. A.* 40:55–1.13, substituting "any municipal public body or municipal officer" for "the public body or officer" and rewording the concluding portion relating to the time for report.

### A.

It is urged that no reference may be made to the planning board under *R. S.* 40:55–11 unless a master plan is first adopted and none was here adopted. Plaintiffs say this prerequisite continues in the 1953 act, but add that in any event the latter act has no retrospective application.

In support of the proposition that no reference may be made to a planning board prior to the adoption of a master plan, plaintiffs cite *City of Rahway v. Raritan Homes, Inc.*, 21 *N. J. Super.* 541 (*App. Div.* 1952), and *City of Newark v. Padula*, 26 *N. J. Super.* 251 (*App. Div.* 1953). Neither case touches the present issue. They said only that the provisions relating to the approval of subdivisions are inapplicable if a planning board has not been created.

The preparation of a master plan is frequently an extended process. Pending a final culmination, matters will arise which bear upon the end product. The statutory purpose may therefore be served by the reference of appropriate matters to the planning board, notwithstanding the absence of a master plan. The limitation which plaintiffs urge does not appear in either the original or the present Planning Act, and we see no reason to infer it. On the contrary, the statute should be liberally construed. *R. S.* 40:55–2; *N. J. S. A.* 40:55–1.3; *New Jersey Constitution, 1947, Art.* IV, § VII, *par.* 11; *Thornton v. Village of Ridgewood,* 17 *N. J.* 499 (1955).

## B.

Plaintiffs next contend the statute does not authorize a reference of the subject matter to the planning board and say the board of adjustment must be utilized. This challenge is the same as the one made to the Hillsborough ordinance with however some additional phases. As in the case of Hillsborough, the reference to the planning board is not designed to determine whether a given use should be permitted or some restriction should be relaxed. The legislative decision as to use was fully made by the governing body. The purpose of the reference is to insure that the details of the site plan for the authorized use will be such that the operation will not offend the public interest. The matter so referred is cognate to the purposes of municipal planning. *R. S.* 40:55–10; *N. J. S. A.* 40:55–1.12.

It would not be feasible to set forth in the ordinance a set of specific requirements upon which the building inspector could readily grant or refuse a permit. Hence, someone has to be empowered to consider whether the details of a proposed site plan square with the legislated standards and to specify the exact terms necessary to meet the standards. Involved is the very expertise expected of a planning board. It therefore makes good sense to engage the board for that purpose. The situation seems to be precisely what the Legislature had in mind in providing for references to the planning board "before final action thereon by the * * * officer having final authority thereon," here the building inspector. It may be noted that Hillsborough provided for final action by the governing body, whereas Montgomery reposed it in the building inspector. Both courses are consonant with the statute.

## V.

Lastly, it is argued that the trial court erred in its ruling upon an offer of the record of the proceedings before the planning board and the township committee. Plaintiffs

offered the testimony included therein as fresh proof on their attack upon the ordinance. The trial court admitted the testimony, but solely as part of the record of proceedings before the bodies, without probative force in support of the charge that the ordinance was an arbitrary exercise of legislative power. The ruling was correct.

The record before the planning board and township committee is pertinent in an inquiry as to whether they observed the statutory requirements for their actions. But insofar as the complaint challenged the ordinance itself, plaintiffs were obliged to support it with original proof.

Plaintiffs rely upon decisions dealing with review of actions of the board of adjustment, such as *Cobble Close Farm v. Board of Adjustment of Middletown Tp.*, *supra* (10 *N. J.* 442); *Scerbo v. Board of Adjustment of Jersey City*, 4 *N. J. Super.* 409 (*App. Div.* 1949), and *Marrocco v. Board of Adjustment of City of Passaic*, 5 *N. J. Super.* 94 (*App. Div.* 1949). But there the board of adjustment sat as a *quasi*-judicial body, and the review accordingly was upon the record before it. Here the action reviewed is legislative. The hearing accorded in a legislative chamber has a wholly different role from the hearing required in a judicial forum and usually takes a different course. In the legislative inquiry policy views are invited; oath is not required; the rules relating to relevancy, materiality and competency need not be heeded; an opportunity for cross-examination need not be granted; and the hearing need not, and frequently does not, exhaust all of the policy considerations which lead to the final legislative judgment. Hence, the record of the legislative hearing was properly admitted only for the limited purpose for which the trial court received it.

The sole authority plaintiffs cite in which legislative action was under attack upon the basis of testimony before the legislative body is *Conlon v. Board of Public Works of City of Paterson*, *supra* (11 *N. J.* 363). The issue here presented was not involved because as appears from the

record in that case the testimony before the legislative body was admitted at the trial by consent in lieu of original testimony.

## CONCLUSION

As stated above, we are satisfied that the townships may lawfully achieve the common purpose to which the ordinances were addressed, but since both ordinances have an infirmity we find to be vitiating, they must be declared to be invalid with respect to the limited industrial districts they create, and accordingly the judgments sustaining the ordinances are reversed.

HEHER, J. (concurring). The "Limited Industrial Zone" delineated by the amendment to the Hillsborough zoning ordinance comprises 684.32 acres owned by the Minnesota Mining and Manufacturing Company and 266 acres owned by others, but so divided as not to be usable by the individual owners for quarrying under the terms of the pertinent regulations. It is stipulated that in view of the provision of the ordinance that a "quarry permit" may be had only by an owner of "at least 200 contiguous acres" in the Limited Industrial Zone, a quarry permit can be had only by Minnesota; and so it is that the 266 acres were made subject to the "quarry use" (although the individual ownerships were such as to render this a purely nominal right) and the alternative preexisting residence and agricultural uses, said to be "worthless" in the circumstances. Indeed, it is affirmed that the Limited Industrial Zone has "the exact area requested by Minnesota Mining, and was not arrived at by any independent comprehensive study," but "to benefit one corporate landowner," and the "terms of the amendment are such that no business or industry other than that of Minnesota Mining can operate in the zone." And a member of the local planning board, when asked if the board had considered whether the Limited Industrial Zone "should be bigger, smaller or in this area or some

other area," replied: "This was the area that was requested by Minnesota Mining to be rezoned as a limited industrial zone."

The exclusion of business and trade from residential districts bears a rational relation to the health and safety of the community. *Euclid, Ohio v. Ambler Realty Co.*, 272 *U. S.* 365, 47 *S. Ct.* 114, 71 *L. Ed.* 303 (1926). But the restriction of this district, zoned for "limited industrial" uses, to stone quarries, residences and agricultural pursuits, excluding light and other industrial uses, not to mention business, is plainly illusory when assessed in the context of the constitutional and statutory considerations to be served by zoning. The amendment to the ordinance is so framed that no business or industry other than Minnesota's quarrying operation is permissible in the zone and particularly in the area of 266 acres, and thus the classification is arbitrary. As just said, it is conceded that no person or corporation other than Minnesota "could meet the acreage requirement * * * for a quarry permit" in this use district. And Minnesota has a permit, not only to operate a quarry in that zone, but also to erect a large rock crushing plant at a cost in excess of two million dollars.

One of defendants' own witnesses, Mr. Hugh R. Pomeroy, director of the Westchester County Department of Planning and also a recognized specialist in the field, testified that "rock crushing" is "a part of a quarrying operation" and is to be "regarded as heavy industry of a natural productive type of use"; and he agreed that the land is "submarginal for agricultural purposes" and "not conducive to residential development," and that "for all practical purposes" the plan would "place the owners of such properties in a position where they have land that is not readily usable for agricultural or residential purposes, and yet under the ordinance no use would be permitted." And he also conceded that a "nonnuisance-laboratory-type building employing a few employees" would not have "any more unfavorable impact on this community than the quarry use permitted."

And Mr. Herbert H. Smith, a professional planner and a consultant on such matters to municipalities and governmental units, also a witness for defendants, testified that it was "furthest from our desire" to "discourage nonnuisance type of industry from coming into Hillsborough," but such was the case in this Limited Industrial Zone, and a "laboratory-type office building, in a park-like setting" would not "hurt the community," yet he doubted the "attractiveness of this area for that type of location * * * from the physical characteristic standpoint."

The use exclusions from this Limited Industrial Zone bear no rational relation to the field of police action comprehended in zoning. The classification is unreasonable and unduly discriminatory, not in keeping with zoning principle and policy. It is fundamental that land use restrictions cannot exceed the public need and the fair requirements of the general good and welfare.

I do not agree that the determination of the particular question should await an application for "another [compatible] specific use." We are concerned now with basic zoning power; and the issue is ripe for decision.

I concur in the result otherwise, and in the Montgomery Township case as well.

HEHER, J., concurring in result.

*For reversal*—Justices HEHER, WACHENFELD, BURLING, JACOBS and WEINTRAUB—5.

*For affirmance*—None.