126 N.J. Super. 169 (1973)
313 A.2d 229
GEORGE TOMASI, INDIVIDUALLY AND TRADING AS GEORGE RICHARDS' FOR MEN, PLAINTIFF,
v.
TOWNSHIP OF WAYNE, A MUNICIPAL CORPORATION OF THE STATE OF NEW JERSEY, DEFENDANT.
Superior Court of New Jersey, Law Division.
Decided December 17, 1973.
*170 Mr. William J. Rosenberg for plaintiff.
Mr. Robert S. Moraff for defendant (Mr. Lawrence D. Katz on the brief).
SCHWARTZ, L., J.C.C., Temporarily Assigned.
Plaintiff, the holder of a barber shop license issued by the State of New Jersey, has challenged the constitutionality of an ordinance adopted by Wayne Township prohibiting barber shops from remaining open for business after 6:30 P.M. on weekdays. He contends that it is an arbitrary exercise of the police power, there being no relationship between the restraint and the public health, safety and welfare to justify the restrictions imposed upon a legitimate and indispensable business.
The municipality contends that the ordinance is a valid exercise of the police power delegated to it by N.J.S.A. 40:52-1(l). The statute which has been in effect since 1917 (L. 1917, c. 97) authorizes municipalities to regulate "the hours of opening and closing on weekdays" of barber shops.
The court is satisfied that the authority to implement this statute has been specifically delegated to the municipality. *171 But it must face the question of the constitutionality of the grant since it has become necessary for the disposition of this matter and the issue is imperative and inescapable. Smith v. Livingston Tp., 106 N.J. Super. 444 (Ch. Div. 1969); State v. Salerno, 27 N.J. 289 (1958).
For this reason plaintiff was required by the court to notify the Attorney General of New Jersey of the pendency of this action, but the State did not participate.
In a number of cases the New Jersey courts have sustained the validity of the statute and ordinances on this subject.
In Falco v. Atlantic City, 99 N.J.L. 19 (Sup. Ct. 1923), a closing hour ordinance and the 1917 closing hour statute were sustained as "well within the limits of the general police powers":
The fruitfulness of many barber shops as spreaders of certain forms of contagious disease is a matter of common knowledge, and the power of the state and its subordinate agents to provide for licensing, regulation, and inspection of such places in the interest of public health cannot be doubted. [at 21]
It must be borne in mind that at that time the barbers were not merely hair stylists and they exercised talents far beyond their passion for voluble self-expression. They engaged in phlebotomy as a therapeutic device, as well as leechcraft, and the reduction of fever by the application of heated suction cups to the body. Teeth extraction by a judicious wrench of the pliers was one of their specialties.
It was not unnatural that a class of persons whose business historically brought its members into close contact with persons suffering bodily infirmities should, before the age of sterilization as we find it today, be made a target of condemnation or restraint.
Barbers were the original surgeons, and since the Middle Ages and until the 20th Century they performed operations and amputations and treated wounds and skin lesions. DeZemler, Once Over Lightly. (1939).
*172 The sign of the barber is still a striped spiral pole, the red fillet representing the bloodied bandages used in their ministrations. Thorpe, Practice and Science of Standard Barbering. (1959).
It is without significance, but of interest, to note that even today, in our statute on barbering, a physician and surgeon are exempt from the operation of the act. N.J.S.A. 45:4-30.
Local health regulations of barber shops ended in 1933 when the Legislature preempted (Coculo v. Trenton, 85 N.J. Super. 523 (App. Div. 1964), as to beauty parlors) the entire field of barber hygiene and sanitation in the State by the adoption of an act to license and regulate barbering, which placed the operations of this occupation under the control of the State Department of Health. (L. 1933, c. 175).
Neither in this statute, nor in the succeeding statutes on the subject, did the Legislature mention or disturb the enabling closing hour statute adopted in 1917, and the delegation to municipalities of a limited power to regulate in the area of hours of closing remains in effect. Tonsorial, Inc. v. Union City, 115 N.J. Super. 33 (Law Div. 1971).
The Legislature, by L. 1938, c. 197, enacted a completely new statute regulating the occupation of barbering, providing for the licensing of persons to carry on such occupation, creating the State Board of Barber Examiners, providing for rules regulating the proper conduct and sanitation of the occupation of barbering, and providing penalties for violation thereof.
This law has been amended during the succeeding years so that currently N.J.S.A. 45:4-27 to 56 comprises a comprehensive set of regulations for licensing, inspection and sanitation requirements for barbers and barber shops.
It would serve no purpose to recite all the statutory provisions to assure hygienic and salutory conditions, but these are some of the regulations mentioned in only one of the chapters, N.J.S.A. 45:4-52:
*173 (a) There shall be readily available at such shop * * * an adequate supply of hot and cold water and where a public water supply under pressure and a sewerage system is available, there shall be provided in such shop * * * a supply of hot and cold running water under pressure. A barber shop owner shall provide at least one wash basin. The wash basin shall be so situated that the same is readily accessible to the operator of each barber chair.
(b) No towel shall be used on any person which has been used upon another patron unless such towel shall have been relaundered and thoroughly dried * * *.
(c) The head rest of a barber chair shall be covered with a clean covering such as a towel or paper before used on any patron. Head rests shall not be placed on the floor at any time.
(d) There shall be placed about the neck of each patron served a clean towel or other clean material to prevent the hair cloth touching the skin of the patron.
(e) Any tool or part thereof which comes into contact with the head, face or neck of the patron such as razors, scissors, tweezers, combs and parts of vibrators shall be immersed in boiling water or in alcohol of a strength of 70% or higher or treated by some other equally effective method before being used on each patron. All tools or instruments when not in use shall be kept in a closed compartment and shall be disinfected before being used on a patron.
(f) Any shaving mug and shaving brush shall be thoroughly rinsed in hot water immediately before use in serving a patron.
(g) At least 2 receptacles for soiled towels and waste shall be provided. Only used towels shall be deposited in one and wastes such as used shaving paper shall be deposited in the other. All towels used on each patron must be deposited in an enclosed towel receptacle. All laundered linen must be kept in a closed compartment at all times.
(h) No styptic pencil, finger bowl, sponge, lump alum or powder puff shall be used except of the individual applicator type.
(j) A sterilizer solution container for each chair adequate in size to immerse all instruments, tools and combs to be used on each patron. Such containers shall be kept filled at all times and shall be completely emptied and cleaned and refilled with prescribed solutions at least once each week.
(o) Any barber shop maintaining toilet facilities for public use shall maintain such facilities in a clean and sanitary condition.
(t) Containers with covers must be provided for the storage of hair trimmings and other waste materials.
(w) No barber * * * shall engage in barbering nor be employed in a barber shop or barber school who is affected with any contagious or infectious diseases in a communicable stage.
(x) No common drinking cup or glass shall be maintained, kept or used.
(z) No barber shall smoke while serving a patron.
*174 Legislating the closing hours for this business regulated so antiseptically cannot be sustained as a measure related to "contagion."
The fading of the menace of unhealthy barber shop environment which has taken place since the years of Falco, supra, can be measured by the disappearance of one of the early appliances, the spittoon, from the modern barber shop.
These early accessories had been prominently placed to accommodate the aim of the customers. However, the withdrawal from the scene of the phlegm and saliva receptacle was anticipated by the first curbing of its extensive use in 1938 when the Legislature provided:
(g) If any cuspidor is provided it shall be thoroughly cleaned at least once each day and there shall be kept in such receptacle a disinfectant solution. [L. 1938, c. 197]
The demise of this accoutrement came in 1963. L. 1963, c. 156 provides:
(k) The use of cuspidors in a barber shop is prohibited.
While the hours of closing statute may have been reasonably related to the unhygienic conditions of barber shops at one time, the court must examine the situation as it exists today. In applying constitutional principles, the statutes and ordinances which are found clearly not to conform to the Constitution, after giving weight to the new conditions, must fall. Euclid, Ohio v. Amber Realty Co., 272 U.S. 365, 47 S.Ct. 114, 71 L.Ed. 303 (1926).
In Amodio v. Bd. of Comm'rs, West New York, 133 N.J.L. 220 (Sup. Ct. 1945), the court held that an ordinance compelling Wednesday afternoon closing for barber shops did not violate the Fourteenth Amendment or N.J. Const. (1844), Art. I, § I, particularly because restricting the hours of persons employed in barber shops safeguarded the health of those who might otherwise be engaged in later *175 hours of service. It characterized as a legitimate concern of government the adoption of regulations having specific relation to competency of the workmen.
The court did not cite any authority for the proposition that early closing hours relate to the competency of barbers, i.e., the ability to be productive without being adversely affected by fatigue.
Studies of the subject of fatigue reject the conclusion that weariness is related to the closing or opening hour. It is related to the actual hours of employment. Workers can be just as competent if engaged on a first, second or third shift.
Fatigue affecting efficiency is related to one's rest the day or night before, the rest periods during the day, wage incentives, the heating, cooling and ventilation of the premises, glare and reflection of lighting facilities, type of barbering services performed, height of chair and of operator, experience, pace of work required, posture habits, orderliness and breadth of working area. Gilbreth, Fatigue Study. (1916).
Under some circumstances efficiency and output per hour are increased by adding a limited number of hours to the normal working day. U.S. Dept. of Labor, Bureau of Labor Statistics, Hours of Work and Output Bulletin No. 917 (1947). Fatigue is related to the efficiency of tools and facilities used and whether they are operated manually or electrically.
Individual differences cause differences in fatigue patterns which cannot be scientifically measured or assumed by a legislature or court. Social attitudes related to oneself or to fellow employees or to customers affect weariness. Whether one is in love or is depressed or ambitious or worried or self-reliant or interested in his job affects fatigue, and the general state of his health and state of his eye health will be reflected in a barber's efficiency.
In City of Louisville v. Kuhn, 284 Ky. 684, 145 S.W.2d 851 (Ct. App. 1940), the court said there is clearly a broad distinction between qualifications for engagement in *176 and conditions under which the barbering business may be conducted, and the particular hours in which it may be done. While the legislature may enact laws expressive of the police power, it may not interfere by arbitrary ipsi dixit with a lawful business where there is no plausible ground therefor, and the court has a duty to say so. It further held that members of the barber occupation are denied due process of law when they are denied the right to serve customers in evening hours, and the public welfare is disserved where men employed during the day cannot receive such service in the evening. The result is in incalculable inconvenience and detriment, both to the barber and to the patron.
In Tonsorial Inc. v. Union City, 115 N.J. Super. 33 (Law Div. 1971), the court set aside a Wednesday barber shop closing ordinance primarily because there was no enabling statute delegating to the municipality authority for such enactment as there was for closing hour regulation.
In State v. Schwarcz, 123 N.J. Super. 482 (Law Div. 1973), the challenge to a barber shop closing ordinance was based upon the failure of the municipality to similarly restrict the closing hours of beauty parlors. The court ruled this was no invidious discrimination constituting a denial of equal protection under the law.
In Fasino v. Mayor, etc., Montvale, 122 N.J. Super. 304 (Law Div. 1973), the court declared invalid an ordinance regulating the opening and closing hours of all retail business establishments. Decisions of our courts and of other courts were marshalled and a conclusion reached that the majority view is that ordinances which restrict particular hours of business operation are invalid unless the businesses regulated present a clear danger to the public health or safety or both.
As was written many years ago in the oft-cited case of Yee Gee v. San Francisco, 235 F. 757 (N.D. Cal. 1916):
For that neither a municipality nor the Legislature of a state may competently interfere under the guise of a police regulation with the liberty of the citizen in the conduct of his business  *177 legitimate and harmless in its essential character  beyond a point reasonably required for the protection of the public, is too thoroughly settled to call for any extended citation of authority in its support. [at 763]
The testimony in the present case established unequivocally that plaintiff's barber shop and the other barber shops in the community had not offended any of the local police regulations in the recent history of the community.
Barber shops in days of yore had been suspect as the place of rendezvous for the lawless, where crimes were hatched and sudden attacks upon the unsuspecting public were planned. This was the place to which gentlemen injured in duels and highwaymen wounded in action would repair. Without intending to reflect upon barber shop quartets, raucous and disturbing noises would emanate from barber shops arising from those whose relations were unharmonious.
The laxity of law enforcement in the area of barber shops was portrayed by Shakespeare in Measure for Measure:
 Laws for all faults
 But calls so countenanced that the strong statutes
 Stand like the forfeits in a barber shop
 As much in mock and mark.
The State's concern for public safety in barber establishments is reflected in the barbering statute.
A person is not qualified to receive a certificate of registration unless he is "of good moral and temperate habits". N.J.S.A. 45:4-31.
A certificate may be revoked for conviction of a felony, gross malpractice, practice by one having an infectious or contagious disease, advertising by means of knowingly false or deceptive statements, habitual drunkenness or habitual addiction to the use of drugs, immoral or unprofessional conduct, and for repeated violation of sanitary rules. N.J.S.A. 45:4-40.
The Board of Barber Examiners, or its representatives, shall have the authority to enter upon and to inspect any *178 barber shop at any time during business hours. N.J.S.A. 45:4-51.
Peace reigns in Wayne. The plaintiff's shop is in a well-lit shopping area where other stores are open in the evening. In considering the challenged ordinance and statute in reference to the circumstances and the locality, the court must seek justification or need for this manner of police power within this community. Euclid, Ohio v. Amber Realty Co., supra. It finds none. The regulation does not go to sanitation or competency of the barber, nor the protection of the public or the barbers themselves in Wayne.
Its relationship to the public welfare is not greater than a statute forbidding the display of price lists for barber services, which was rejected as arbitrary in State v. Garrubo, 124 N.J.L. 19 (Sup. Ct. 1940).
While the underlying rule of law is that statutes and ordinances are entitled to a strong presumption of validity, Roe v. Kervick, 42 N.J. 191 (1964), and may only be overcome by a clear showing that they are arbitrary or unreasonable, Kozesnik v. Montgomery Township, 24 N.J. 154 (1957), "health, safety and welfare" has been used as a talisman (to ward off evil spirits)  a deceptively compelling ring. The touchstone of the reasonableness of the control is to be found in the relation of the regulation to the health, safety and welfare of the general community. If there is none, the regulation must be struck down as arbitrary and an invasion of the constitutional right of private property. Excesses in serving the public end in view are unacceptable. Collins v. Board of Adjustment, Margate City, 3 N.J. 200 (1949); N.J. Good Humor, Inc. v. Bradley Beach, 124 N.J.L. 162 (1940).
The aria of El Figaro of Wayne is clear and persuasive. The statute as it applies to this municipality, and the ordinance, constitute invalid exercises of the police power.
Let a judgment be entered, without costs, enjoining Wayne Township from enforcing this ordinance.